## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FENYANG AJAMU STEWART, | ) |
| | ) |
| Plaintiff, | ) Civil Action No: <u>1:25-cv-01288</u> |
| | ) |
| | ) <u>**JURY TRIAL DEMANDED**</u> |
| v. | ) |
| | ) |
| ELON MUSK, | ) |
| in his individual capacity; | ) |
| | ) |
| BROOKE ROLLINS, | ) |
| in her official capacity as | ) |
| Secretary of Agriculture, and | ) |
| in her individual capacity; | ) |
| | ) |
| STEVEN BRAMMER, | ) |
| in his individual capacity; | ) |
| | ) |
| PATRICIA ST. CLAIR; | ) |
| in her individual capacity; | ) |
| | ) |
| HEATHER IHLENFELDT, | ) |
| in her individual capacity; | ) |
| | ) |
| DERRIK ALLEN, | ) |
| in his individual capacity; | ) |
| | ) |
| VIVIAN HUTSON, | ) |
| in her individual capacity; | ) |
| | ) |
| and | ) |
| | ) |
| JOHN and JANE DOES 1–10, | ) |
| in their individual capacities, | ) |
| | ) |
| Defendants. | ) |

**RECEIVED**

MAY 1 2025

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## <u>AMENDED COMPLAINT</u>

COMES NOW, Fenyang Ajamu Stewart ("Plaintiff"), and files this Amended

Complaint against Defendants Elon Musk ("Musk"), Brooke Rollins ("Rollins"), Steven

Brammer ("Brammer"), Patricia St. Clair ("St. Clair"), Heather Ihlenfeldt ("Ihlenfeldt"),

Derrik Allen ("Allen"), Vivian Hutson ("Hutson"), and Defendants John and Jane Does 1-10 (currently unknown, to be substituted at a later date), all sued in their individual capacities only (except for Rollins, who is being sued in her official and individual capacity as well), for conspiring to violate his civil and constitutional rights pursuant to 42 U.S.C. § 1985(3), or for having knowledge of the same and failing to prevent it from occurring pursuant to 42 U.S.C. § 1986, along with other causes of action, and for injunctive and declaratory relief, compensatory and punitive damages, and in support thereof, states as follows:

## INTRODUCTION

1.      Defendant Elon Musk, acting in an unofficial advisory role to the current President, Donald J. Trump, and various federal agencies by proxy, has spearheaded an Artificial Intelligence (AI)-driven purge of the federal workforce that intentionally targets civil rights enforcement officials who conduct mandatory yearly reporting, based on statistical analysis of the advancement of employment opportunities of minorities and qualified individuals with targeted disabilities ("barrier analysis"). These analyses are mandated under the Rehabilitation Act and Title VII and/or regulations that are promulgated under these statutes by the Equal Employment Opportunity Commission. These barrier analyses are often used by Federal agencies to design proactive, non-discriminatory measures that are predicted to bring parity to disadvantaged groups that were historically marginalized, including but not limited to Black employees, qualified disabled employees, women, and Hispanic employees.

2.      However, Musk's reckless manner in which he advised President Trump to conduct a purge or other wise discriminatory downsizing of the Federal government via usage of artificial intelligence (AI) data analysis techniques and Executive orders to conduct job

2

eliminations of all positions that had DEIA in their job description along with other goals, purportedly to eliminate fraud, waste, and abuse.

3.      However, the resultant policies promulgated  as a direct result of Musk's transferred discriminatory animus has resulted in the unlawful termination and suppression of federal EEO personnel, effectively dismantling civil rights enforcement within federal agencies. Plaintiff has faced the revocation of his granted remote work reasonable accommodation, with no regard for any actual changes in his condition that would warrant reevaluation, since the purpose of said reevaluation is to coerce Plaintiff into involuntarily resigning due to being unable to carry out his duties in the workplace at USDA headquarters without equally effective accommodations.

4.      In addition, because Plaintiff has been requested to Civil Rights Equity Analysis training or otherwise barrier analysis training, which is a legally mandated requirement as a part of USDA's annual MD-715 report to Congress, Plaintiff is at risk of having his position eliminated in an unlawful Reduction-In-Force (RIF) in the near future since that role is DEIA related.

5.      This orchestrated campaign violates the Administrative Procedure Act (APA), due process rights, and civil rights laws by using biased AI models and promulgating Musk's disability-based animus to Trump and Agency Heads, including Rollins, and all managers, in order to eliminate positions responsible for conducting these analyses and to eliminate all remote work arrangement, including those held as RAs by qualified disabled employees..

6.      Musk's intentional and reckless actions have caused Plaintiff severe financial, reputational, and emotional distress damages, warranting punitive damages of upwards of $1 billion dollars to deter future misconduct.

3

**Reasons for Federal Court Intervention**

7.    At its core, this case is about dignity. This isn't just about accommodation. It's about the denial of dignity, something all Americans hold sacred.

8.    Dignity is the invisible scaffolding that allows Americans to show up to work with heads held high, regardless of disability, background, or circumstance. When the government, of all institutions, strips that away through covert retaliation, forced reevaluation, or coerced resignation—it violates the very covenant between Federal Employee and the Executive Department as guaranteed by the Constitution Fifth Amendment—the right to continued Federal employment and to due process with any attempt at removal of said employment.

9.    Plaintiff did not ask for any privilege—he asked for what the law guarantees: an equitable opportunity to do his job with dignity, as guaranteed under the Rehabilitation Act. Since the Rehabilitation Act calls for lawful equity-based employment opportunities, the Defendant's anti-DEIA stance is in direct conflict with the law and must be reigned in judicially by this Honorable Court. Remote work was never a luxury for Plaintiff, nor just a term of employment. It was a lifeline—one legally recognized, medically supported, and operationally proven. And yet, USDA officials sought to convert that dignity into a disciplinary trap, coercing him to either surrender his rights or be removed for fgailure to follow instructions.

10.    That's the heart of this lawsuit. Not entitlement. Not optics. But the raw, human, sacred right to dignity. When America denies that right to its own civil servants—particularly those with disabilities—it doesn't just break the law. It breaks faith with the very principles it claims to defend. Therefore, this suit is brought in the spirit of justice and to hold those who viciously trample on the rights of the disabled accountable. It's time for checks and balances, and a jury of Plaintiff's peers to bring judgment & justice.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

12.    This Court possesses proper subject matter and personal jurisdiction over the parties.

13.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in the District of Columbia. The decisions, policies, and actions challenged in this Amended Complaint were made and executed by all Defendants (except Musk) at the headquarters of the United States Department of Agriculture ("USDA"), located in Washington, D.C. Accordingly, the Court has personal jurisdiction over over Rollins, St. Clair, Ihlenfeldt, Allen, Hutson, and Brammer.

14.    Musk, a senior advisor to President Donald J. Trump, volunteers or works at the Department of Government Efficiency ("DOGE"), which is located in Washington, D.C. Musk's advice and policy direction occurred either through DOGE, through personal conversations with President Trump at Mar-a-Lago and other locations, or via media outlets like the Wall Street Journal that is distributed in Washington D.C.; Musk thus has significant contacts with the District of Columbia for the Court to have personal jurisdiction over Musk.

### The OASCR Defendants' Ultra Vires Conduct Robs Them of Qualified Immunity

15.    Plaintiff brings this action pursuant to 42 U.S.C. § 1985(3) for conspiracy to deprive a person of the equal protection of the laws and equal privileges and immunities under the law. Defendants St. Clair, Allen, Hutson, Ihlenfeldt, collectively (the OASCR defendants) and other unknown actors (John and Jane Does 1-10) are sued in their

individual capacities for actions taken outside the scope of their lawful authority and in violation of clearly established statutory and constitutional rights.

16.     The OASCR defendants are not entitled to qualified immunity, as their conduct violated clearly established law under the Rehabilitation Act of 1973, which prohibits discrimination and retaliation against qualified individuals with disabilities and requires that reasonable accommodations be evaluated through individualized assessments, not subject to blanket revocation or reevaluation without good cause, which is what occurred at all times relevant.

17.     The OASCR Defendants knew or should have known that their actions were unlawful. By enforcing the blanket reassessment scheme without legal justification, they violated Plaintiff's clearly established constitutional rights of continued employment with due process and equal protection under Federal Law, which includes the right to reasonable accommodation and freedom from coercion, threats, and/or intimidation to forego those accommodations needed to remain qualified. Accordingly, the OASCR Defendants' conduct is not protected by qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

18.     USDA's own guidance explicitly stated that their Return to Office (RTO) policy "does not supersede existing reasonable accommodations." See USDA RTO memorandum and the OASCR RTO memorandum as set forth in Ex. 8.

19.     Nonetheless, the OASCR Defendants, as a result of Musk's transferred intent to discriminate against qualified employees with disabilities, conspired to implement a blanket reassessment policy that treated remote work as an accommodation of "last resort".

20.     The OASCR Defendants planned to revoke all revoke all such accommodations including the one held by Plaintiff by coercing him into an interactive process entered into

in bad faith by said Defendants in order to revoke his remote accommodation under the guise of due process; a pretext for disability discrimination.

21.     The plan was to determine that Plaintiff's existing remote work RA was no longer effective due to a change of business requirements and that he could remained qualified by working at the USDA headquarters office with equally effective alternate accommodations. This plan was obviously discriminatory since his remote work accommodation had already been proven effective since he had obtained a "Fully Successful" annual performance rating since the accommodation was instituted and no change in his medical condition had occurred warranting reevaluation.

22.     The OASCR defendants may attempt to argue that they were following guidance from Secretary Brooke Rollins, the USDA Office of Operations, or Executive Orders, and are thus protected from suit under the doctrine of qualified immunity. However, following orders does not shield government officials from liability when those orders are manifestly unlawful and violate well-established rights. Defendants are professionals in the field of Equal Employment law and had a duty to uphold that law, not to carry out discriminatory policies under color of official authority. Their actions were not only unauthorized, but were a slap in the face to the Congressman who mandated the Federal government be a "Model Employer" of employees with disabilities.

23.     Accordingly, the actions taken by OASCR defendants were ultra vires, meaning they exceeded the scope of their lawful authority and were taken without legal justification. Under the Rehabilitation Act, agencies may not revoke or reassess granted reasonable accommodations absent an individualized assessment, a material change in the employee's medical condition, or demonstrable undue hardship. None of these conditions existed in Plaintiff's case nor in the cases of similarly situated disabled employees.

24.     Nevertheless, Defendants implemented and enforced a blanket policy mandating the reevaluation of all existing remote work accommodations—directly contradicting USDA's own guidance that the Return-to-Office (RTO) policy "does not supersede existing reasonable accommodations."

25.     By acting to, or directing subordinate officials to, reassess, deny, or alter existing reasonable accommodations without individualized review, the OASCR defendants acted outside the scope of their delegated authority and contrary to binding federal law, including: The Fifth Amendment, which requires due process before removal for failure to perform or misconduct; The Rehabilitation Act of 1973, which prohibits disability-based discrimination in federal employment and mandates the provision of reasonable accommodations; EEOC Enforcement Guidance 915.002, which affirms that reassignment—not remote work—is the "accommodation of last resort"; 5 U.S.C. § 2301(b)(2) and (b)(8), which require fair treatment and prohibit arbitrary personnel actions; and 5 U.S.C. § 2302(b)(12), which forbids any personnel action that violates a law, rule, or regulation implementing a merit system principle.

26.     Since the OASCR defendants acted without legal authority and in clear violation of well-established law, their conduct is not shielded by qualified immunity. Their ultra vires conduct strips these federal officials of such protections, especially where—as here—the constitutional and statutory rights at stake are clearly established, and the officials had training and actual notice of the unlawfulness of their actions (Plaintiff explained via email to the OASCR Defendants that their actions were unlawful as described herein).

27.     As such, Defendants' actions are void and subject to judicial remedy, including injunctive and declaratory relief, a jury trial to determine compensatory and punitive damages, and even the appointment of a Federal monitor to ensure compliance with anti-discrimination mandates going forward and other mandamus relief.

28.     Accordingly, this Court has jurisdiction under 28 U.S.C. § 1331 and § 1343(a)(3), and Plaintiff seeks both compensatory and punitive damages under 42 U.S.C. § 1985(3) for the intentional, knowing, and reckless conduct of Defendants acting under color of law but outside the bounds of legal authority.

29.     Defendants Rollins, Brammer, and Hutson are sued in their individual capacities for her failure to take action to prevent the ongoing conspiracy to deprive Plaintiff of his clearly established rights under the Fifth Amendment and the Rehabilitation Act. As the Secretary of Agriculture and final policymaker for the U.S. Department of Agriculture, Defendant Rollins had actual and constructive knowledge of the discriminatory blanket reassessment policy through Plaintiff's whistleblower disclosure sent directly to her via email. Despite this notice, she failed to intervene, correct the unlawful directive, or prevent her subordinates from implementing it.

30.     Plaintiff sues Defendant Rollins in her individual capacity for damages under 42 U.S.C. §§ 1985 and 1986, and in her official capacity solely for injunctive and declaratory relief under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706.

31.     Qualified immunity does not apply to Defendants Rollins, Brammer, and Hutson because no reasonable official in their positions could have believed that allowing a non-individualized, department-wide reevaluation of existing remote work accommodations—despite agency guidance stating that RTO policy does not supersede those accommodations and that the RTO must be conducted in accordance with all applicable existing laws—was lawful. Their failure to act in the face of a known constitutional and statutory violation constitutes deliberate indifference and violates clearly established law.

32.     All Defendants except Musk may attempt to argue that they were following guidance from the Office of Personnel Management. However, following orders does not

9

shield government officials from liability when those orders are manifestly unlawful and violate well-established rights. Said Defendants had a duty to uphold the law, not to carry out discriminatory policies under color of official authority. Their actions were not only unauthorized, but, upon information and belief, also motivated by discriminatory animus against employees with disabilities who received remote work accommodations, and constituted harassment, coercion, and retaliation in violation of federal law.

**Musk, a Unofficial Volunteer and Architect of the RTO, is Exposed to Liability**

33.     This Court has personal jurisdiction over Defendant Musk because Musk, at all times relevant, served as a volunteer advisor to the Trump Administration in matters relating to federal government operations, including remote work policy, through his role in the Department of Government Efficiency (DOGE), which maintains its operational base in Washington, D.C.

34.     Additionally, the editorial co-authored by Musk and published in The Wall Street Journal—which forms the basis of the discriminatory intent alleged herein—was disseminated and directed toward federal agencies headquartered in Washington, D.C., including the U.S. Office of Personnel Management (OPM) and the U.S. Department of Agriculture (USDA).

35.     Musk maintains sufficient minimum contacts with the District of Columbia such that the exercise of jurisdiction over him comports with traditional notions of fair play and substantial justice.

36.     Accordingly, qualified immunity does not apply to Defendant Musk. As a private individual and volunteer advisor, Musk was not acting as a government employee or official entitled to assert qualified immunity but merely under the color of Federal law. The doctrine of qualified immunity only shields government officials performing discretionary functions in their official capacities. Musk's alleged involvement—designing or

influencing the Return to Office (RTO) policy and the AI-based elimination of positions involving DEIA, and co-authoring public-facing materials advocating for discriminatory actions toward federal employees, including those with disabilities—was undertaken outside any formal appointment, statutory delegation, or lawful executive function.

37.     Even if Musk were found to be acting with some degree of official influence, his actions were ultra vires, as they encouraged and catalyzed the deprivation of federally protected rights, particularly those guaranteed under the Rehabilitation Act and the Fifth Amendment. Therefore, he cannot invoke qualified immunity, nor can he escape liability under 42 U.S.C. §§ 1985 and 1986, which expressly apply to "any person" acting in furtherance of a conspiracy to violate civil rights.

38.     Accordingly, this Court has jurisdiction over all defendants under 28 U.S.C. § 1331 and § 1343(a)(3), and Plaintiff seeks both compensatory and punitive damages under 42 U.S.C. § 1985(3) for the intentional, reckless indifference all defendants demonstrated against Plaintiff while acting under color of Federal law and outside the bounds of legal authority.

39.     Personal Jurisdiction of the Court is proper over Plaintiff because Plaintiff, although a resident of the Commonwealth of Virginia, is employed by USDA, which is headquartered in the District of Columbia. The events giving rise to this action—including the development and implementation of discriminatory policies, and the decisions affecting Plaintiff's employment status—occurred in whole or in substantial part in the District of Columbia. Accordingly, Plaintiff has sufficient contacts with the District related to this action to support the exercise of personal jurisdiction.

40.     For the foregoing reasons, Plaintiff asserts subject matter jurisdiction and personal jurisdiction of the Court is established in this manner.

## PARTIES

41.    **Plaintiff** is currently employed as a GS-0260-13, Equal Employment Specialist, currently employed with USDA, in the Employment Adjudication Division (EAD), Center for Civil Rights Enforcement (CCRE), Office of the Assistant Secretary for Civil Rights (OASCR). Plaintiff is a career-permanent employee with tenure in the competitive service. A copy of his most recent SF-50 reflecting these facts is set forth in Ex. 1.

42.    Plaintiff began working for USDA on July 3, 2022. At all times of employment with USDA, Plaintiff worked remotely from his residence located in Alexandria, VA.

43.    At all times relevant, Plaintiff was and is a qualified federal employee with a documented disability, Post-Traumatic Stress Disorder (PTSD), Panic Disorder, and severe back pain, who at all relevant times needed and was granted the reasonable accommodation of remote work in order to remain qualified.

44.    Plaintiff's PTSD is a mental impairment that substantially affects the major life activities of thinking and concentrating.

45.    Plaintiff's severe back pain is a physical impairment that substantially affects the major life activities of sitting and standing, and lifting.

46.    Plaintiff's Panic Disorder is a mental impairment that substantially affects the major life activities of thinking, concentrating, and breathing.

47.    On or around July 8, 2023, Plaintiff was granted the reasonable accommodations of remote work and use of ergonomic equipment (including a standing desk and inversion table) by the Agency for his disabilities, PTSD, panic disorder, and severe back pain. The decision was issued by his supervisor at the time, Kirk Perry. A copy of the decision letter is set forth in Ex. 2. The decision stated:

> Remote working will allow you to work in a setting that has less distractions and you can control (i.e., noise and activity level, foot

12

traffic, sound, etc.). Also, it will allow you and your emotional support dog, Smokey, to remain in an environment that is comfortable, and you can effectively manage any flare-ups (i.e., take prescribed medication, take a break, meditate, etc.). The use of ergonomic equipment will allow [you] to [] change positions from sitting to standing and vice versa throughout the day to mitigate the chronic back pain.

Ex. 2.

48.    At all times relevant, Plaintiff's performance was determined by the Agency to be "Fully Successful" for Fiscal Year (FY) 2023 and outstanding by his team lead for FY 2024. A copy of Plaintiff FY '23 performance evaluation is set forth in Ex. 3.

49.    Plaintiff was issued a monetary award and a letter of commendation for said performance in FY 23 by OASCR. A copy of said letter is set forth in Ex. 4.

50.    On October 1, 2024, Kimberly Strickland, the Acting Director of EAD at that time, stated in an email to the appointed Performance Rater for EAD, Anzanette Randall, "[Plaintiff] and I held our end of year discussions today. [Plaintiff] had an outstanding performance year. Please let me know if there is anything further you need from me". A copy of said email is set forth in Ex. 5.

51.    Plaintiff and all of EAD did not receive performance ratings for FY 2024. A reasonable inference can be made from Ms. Strickland's email that Plaintiff would have been rated "Fully Successful" for FY 2024 had he been issued an official rating of record.

52.    Plaintiff was issued a monetary award and a letter of commendation for said performance in FY 24 by the then Deputy Assistant Secretary for Civil Rights, the Honorable Dr. Penny Brown Reynolds. A copy of said letter is set forth in Ex. 6.

53.    Accordingly, at all times relevant, Plaintiff was a qualified employee with a disability with the reasonable accommodations of remote work, ergonomic equipment and the implicit accommodation of the MaxiFlex work schedule he was on.

13

54.     **Defendant Elon Musk** ("Musk") is a volunteer senior advisor to the Trump Administration during the relevant time period. Musk is a resident of Texas with an office in Washington D.C. and is being sued in his individual capacity.

55.     At the time this complaint was filed at the time the causes of action in this complaint arose, Musk held an unofficial but influential position in the Federal government as the unauthorized but *de facto* leader of the Department of Government Efficiency (DOGE), a volunteer advisory group established on January 20, 2025, via executive order by President Donald Trump.

56.     Through this leadership role, Musk provided guidance and input regarding federal workforce restructuring and agency operations throughout the Federal government, including the formulation and promotion of Deferred Resignation Programs (DRPs), Return to Office (RTO) policies, and Reduction-in-Force (RIF) policies, including those promulgated by the Office of Personnel Management (OPM) and USDA on or around February 2025 and continuing.

57.     On November 20, 2024, Musk previously co-authored a Wall Street Journal editorial with Vivek Ramaswamy, promoting the use of RTO mandates to make federal employment so uncomfortable that workers would voluntarily quit—an express discriminatory motive. A copy of said article is set forth in Ex. 7 is Specifically Musk stated:

> A drastic reduction in federal regulations provides sound industrial logic for mass head-count reductions across the federal bureaucracy. DOGE intends to work with embedded appointees in agencies to identify the minimum number of employees required at an agency for it to perform its constitutionally permissible and statutorily mandated functions. The number of federal employees to cut should be at least proportionate to the number of federal regulations that are nullified: Not only are fewer employees required to enforce fewer regulations, but the agency would produce fewer regulations once its scope of authority is properly limited. Employees whose positions are eliminated deserve to be treated with respect, and DOGE's goal is to help

> support their transition into the private sector. The president can use existing laws to give them incentives for early retirement and to make voluntary severance payments to facilitate a graceful exit....
>
> Mr. Trump can implement any number of "rules governing the competitive service" that would curtail administrative overgrowth, from large-scale firings to relocation of federal agencies out of the Washington area. Requiring federal employees to come to the office five days a week would result in a wave of voluntary terminations that we welcome: If federal employees don't want to show up, American taxpayers shouldn't pay them for the Covid-era privilege of staying home.

Ex. 7.

58.    Here, by stating, "Requiring federal employees to come to the office five days a week would result in a wave of voluntary terminations that we welcome," Musk has, by direct evidence of his own words, admitted he harbors invidious animus towards disabled Federal employees, including Plaintiff, who have been granted remote work as a reasonable accommodation, and can only remain qualified in their position via said granted accommodation; being forced back into work in an office would result in resignation that Musk welcomes.

59.    Indeed, Musk expects Plaintiff and other qualified disabled employees with remote work accommodations to resign voluntarily after their accommodations are revoked for no valid reason and they are instructed to return to work in the office by management.

60.    However, the Rehabilitation Act mandates Federal Agencies, including USDA, take affirmative action to keep disabled employees qualified for employment by granting them reasonable accommodations that would allow them to remain qualified. Accordingly, USDA, by direct evidence of granting Plaintiff the RA of remote work, has conceded that remote work RA is the most effective accommodation (in combination with his other implied accommodation of a maxiflex work schedule) and that no other accommodations are as equally effective.

61.     To the extent that Plaintiff and other similarly situated employees could be lawfully subjected to reevaluation of their granted accommodations, neither the RTO mandate nor new arbitrary rules implemented by the Agency in conjunction with said mandate (e.g., all employees with RAs over a year old have to be reevaluated) are lawful grounds for doing so.

62.     According to USDA Departmental Regulation 4300-08, Reasonable Accommodations and Personal Assistance Services for Employees and Applicants with Disabilities, "An RA may be reevaluated under certain circumstances such as: (1) Responsibilities or essential job functions change; (2) Staffing levels change; (3) The employee's medical condition improves or declines; or (4) The RA is no longer effective".[1]

63.     At the time the Agency subjected Plaintiff to reevaluation of his granted RA of remote work, his responsibilities and essential job functions (legal research and writing, legal & statistical analysis, proofreading, etc.) had not changed; staffing levels in EAD had not changed; Plaintiff's responsibilities or essential job functions had not changed; (2) USDA's staffing levels had not change and no new business functions had arisen that were not pretextual in nature.

64.     Specifically, Plaintiff's permanent medical condition had not changed; and the RA was still effective. Accordingly, the Agency had no valid reason to reevaluate his granted accommodation of remote work.

65.     However, Musk's intent to discriminate against disabled employees transferred to to all "embedded appointees" of President Trump's cabinet, including the Secretary of Agriculture, Brooke Rollins, and resulted in USDA rolling out an RTO policy legally

---

[1] USDA. DR 4300-08. *Reasonable Accommodations and Personal Assistance Services for Employees and Applicants with Disabilities*. 2020. Oct. 27, 2020. https://www.usda.gov/directives/dr-4300-008

reviewed or implemented in a discriminatory manner by Brammer, St. Clair, Allen, Hutson, and Ihlenfeldt.

66.     This occured despite the issuance of a memorandum stating USDA's RTO policy does not supersede existing RAs (reasonably inferred to mean RAs of remote work). A copy of the USDA RTO memorandum and the OASCR RTO memorandum is set forth in Ex. 8.

67.     **Defendant Brooke Rollins** ("Rollins") is the Secretary of Agriculture and works at USDA headquarters located at 1400 Independence Avenue SW, Washington, D.C. Rollins is sued in her individual and official capacities.

68.     **Defendant Patricia St. Clair** ("St. Clair") is the Associate Assistant Secretary for Civil Rights, OASCR, USDA, and is Plaintiff's third-line supervisor. St. Clair works at USDA headquarters located at 1400 Independence Avenue SW, Washington, D.C. She is sued in her individual capacity.

69.     **Defendant Derrik Allen** ("Allen") is Plaintiff's direct supervisor and the Director of EAD, and works at USDA headquarters located at 1400 Independence Avenue SW, Washington, D.C. Allen is sued in his individual capacity.

70.     **Defendant Vivian Hutson** ("Hutson") is Plaintiff's second-line supervisor and is Executive Director of CCRE, OASCR, and decision-maker for internal appeals of denials of reasonable accommodation requests made by OASCR employees. Hutson works at USDA headquarters located at 1400 Independence Avenue SW, Washington, D.C.. Hutson is sued in her individual capacity.

71.     **Defendant Heather Ihlenfeldt** is the Reasonable Accommodation Coordinator (RAC) for OASCR and other USDA components who facilitates the processing of reasonable accommodation requests, makes determinations on whether employees have presented sufficient medical information that qualifies them for a reasonable

17

accommodation, and makes recommendations to supervisors whether to grant or deny an employee's reasonable accommodation request.

72.    **Defendant Steven Brammer** ("Brammer") is an Associate General Counsel in USDA's Office of the General Counsel, and upon information and belief, works at USDA headquarters located at 1400 Independence Avenue SW, Washington, D.C.  He is sued in his individual capacity.

73.    **Defendants John and Jane Does 1-10** are unknown USDA officials or otherwise individuals who, upon information and belief, participated in or facilitated an alleged conspiracy to violate Plaintiff's rights under 42 U.S.C. §§ 1985(3) and 1986. They may be added to the lawsuit at a future date and be sued in their individual and/or their official capacities.

## BACKGROUND

### A. Musk's AI-Powered Purge of Civil Rights Enforcement

74.    As a high-profile advisor to President Trump and Rollins federal agencies, Musk advocated for AI-based workforce restructuring. The AI system Musk endorsed and helped design disproportionately targets positions in civil rights enforcement, including those responsible for adjudicating EEO complaints under Title VII, because EEO specialists are mandated to conduct annual barrier analysis, that directly involved DEIA statistical analysis of employment, promotions, firings, and hiring based on race, national origin, disability, and other protected classes.

75.    The AI models were programmed to assess "efficiency," but in practice, they disregarded the complexity and legal discretion required for civil rights adjudications. Elon Musk in real-life brandished a chainsaw in a accurate representation of how he chose to

18

eliminate thousands of positions throughout the Federal without in depth analysis, knowledge management, process improvement, all in a span of less than 6 months.

76.    As a result, EEO positions are being disproportionately marked for elimination, effectively silencing internal complaints of discrimination and violating the rights of federal employees, especially the rights of disabled Federal employees to fair adjudication of the merits of their complaints, which Plaintiff has been prevented from carrying out even though it is one of the essential duties of his position.

77.    Certain Agencies entire Civil Rights departments, including the Department of Education and the Social Security Administration, have been eliminated, under the guise of redistributing essential tasks to other employees or otherwise contractors.

**B. Plaintiff's Role as an EEO Adjudicator and Retaliatory Targeting**

78.    Plaintiff is a Final Agency Decision (FAD) writer and civil rights adjudicator at the U.S. Department of Agriculture (USDA), Office of the Assistant Secretary for Civil Rights (OASCR).

79.    Plaintiff's primary responsibility is to analyze and issue legally binding decisions in discrimination complaints filed against USDA.

80.    Plaintiff has received outstanding performance reviews and commendations for their work ensuring compliance with federal anti-discrimination laws.

81.    However, under Musk's AI-driven workforce reduction initiative, Plaintiff's position, upon information and belief, was improperly flagged for possible elimination, based on his DEIA related roles that he has actively participated in in the past, despite its critical role in upholding civil rights protections, as mandated by various statutes, including Title VII and the Rehabilitation Act.

19

82.    This targeting is not based on performance, efficiency, or necessity—rather, it is part of a systematic effort to dismantle federal civil rights enforcement by removing adjudicators responsible for finding discrimination.

**Evidence of Elon Musk's Animus Toward Employees with Disabilities**

83.    In March 2023, Elon Musk publicly mocked Haraldur "Halli" Thorleifsson, a Twitter employee with muscular dystrophy, after Thorleifsson sought clarity about his employment status after he got locked out of his computer. Musk questioned the legitimacy of Thorleifsson's disability and his work contributions, stating, "The reality is that this guy (who is independently wealthy) did no actual work, claimed as his excuse that he had a disability that prevented him from typing, yet was simultaneously tweeting up a storm. Can't say I have a lot of respect for that." Musk later apologized for the tweet because it came to light that the individual was a qualified employee with reasonable accommodations; however Musk claimed that parts of his tweet were true, but did not specify further. Musk later tweeted that Thorleifsson was "considering remaining at Twitter." This public derision of an employee's disability is evidence of Musk's class-based animus towards qualified individuals with disabilities and intent to discriminate against them in their continued employment.[2]

84.    In early 2025, Musk's use of the derogatory R-word on his platform, X (formerly Twitter), was highlighted in a Guardian newspaper article discussing the resurgence of such slurs in right-wing circles. Musk's engagement with this language, including a post where he stated, "I'm tempted to call this guy a retard, but I won't because I've used that word too many times," exemplifies his willingness to employ language that dehumanizes individuals with intellectual disabilities. Such language is evidence of Musk's class-based animus

---

[2] Kristen McCrory, *Elon Musk Apologizes for Mocking Twitter Worker with Disability*, Axios (Mar. 8, 2023), https://www.axios.com/2023/03/08/musk-apology-mocking-twitter-worker-disability.

towards qualified individuals with disabilities and his intent to discriminate against them and perpetuate a hostile work environment that marginalizes and stigmatizes people with disabilities.[3]

85.    Following his acquisition of Twitter, Musk implemented a strict return-to-office mandate, effectively ending remote work accommodations. This policy change led to the dismissal of employees who, due to their disabilities, could not comply with the in-office requirement. One such case involved Dmitry Borodaenko, a cancer survivor who was terminated after requesting to continue working remotely as an accommodation for his disability.[4] While a federal judge initially dismissed Borodaenko's lawsuit, the case highlights the tangible impact of Musk's policies on employees with disabilities, which he promulgated via DOGE through his tremendous influence over President Trump, whose 2024 Presidential campaign he donated over 200 million dollars too.

86.    A reasonable inference can be drawn that Elon Musk's demonstrated animus toward employees with disabilities influenced federal policy under the Trump administration, particularly where Musk was given broad and direct access to executive decision-making channels, including OPM and the Department of Government Efficiency (DOGE). As a result, key agency officials, including Brooke Rollins, implemented policies such as DRP 2.0 and RTO mandates in alignment with Musk's vision. These policies, though facially neutral, had the predictable and disproportionate effect of targeting qualified federal employees with disabilities—an effect consistent with Musk's expressed views and therefore probative of discriminatory intent under a "cat's paw" theory of liability.

---

[3] Oliver Laughland, *Use of "R-word" on the Rise Among Rightwing Influencers: "It's a Badge of Honour"*, The Guardian (Mar. 3, 2025), https://www.theguardian.com/world/2025/mar/03/r-word-right-wing-rise.
[4] Allegra Frank, *Former Twitter Employee, a Cancer Survivor, Says Elon Musk Mocked His Disability*, Yahoo! News (Mar. 7, 2023, 9:32 PM),
https://www.yahoo.com/news/former-twitter-employee-cancer-survivor-023226100.html.

## Statutory Background

87.    The Rehabilitation Act "was the first major federal statute designed to provide assistance to the whole population of" individuals with disabilities. *Shirey v. Devine*, 670 F.2d 1188, 1193, 216 U.S. App. D.C. 369 (D.C. Cir. 1982). The Act's purpose is to ensure that the federal government is "a model employer of individuals with disabilities," 29 C.F.R. § 1614.203(a), and is proactive in their "hiring, placement, and advancement," 29 U.S.C. § 791(b).

88.    The Act, as amended, directs courts to employ the standards of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., in evaluating suits that, as relevant here, allege that an employer unlawfully denied an accommodation. *See* 2 9 U.S.C. § 791(g); *see also* 29 C.F.R. § 1614.203(b) (applying to the Rehabilitation Act the standards in the Americans with Disabilities Act regulations, 29 C.F.R. Part 1630). Specifically, the Rehabilitation Act requires federal employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). An "individual with a disability" includes a person with "a physical or mental impairment that substantially limits one or more major life activities." Id. § 12102(1)(A). To be a "qualified individual" entitled to the Rehabilitation Act's protections, an individual must be able to perform, "with or without reasonable accommodation," "the essential functions of the employment position that such individual holds or desires." Id. § 12111(8).

89.    The Rehabilitation Act also forbids retaliation against or coercion of individuals who seek to vindicate the rights guaranteed by the statute. The Act does so by making it unlawful both (i) to retaliate "against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter," 42 U.S.C. § 12203(a), and (ii) to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter," *id.* § 12203(b).

**The RTO Guidance Exempted Plaintiff from Returning  to In-Office Work**

90.     Plaintiff's adjudicatory job duties were not front-facing and entailed reading, legal research, legal analysis, and typing.

91.     Plaintiff's remote work accommodation, in combination with his Maxi-Flex work schedule, was the most effective accommodation that allowed him to be a qualified employee for the duration of his employment. By working from home, Plaintiff was and is able to have access to his emotional support animal, Smokey, a canine, during times when his disability is exacerbated, and also access and use of a standing desk, ergonomic seating, and the ability to take intermittent breaks for rest and use an inversion table throughout the day.

92.     A reasonable inference can be drawn that Elon Musk's demonstrated animus toward employees with disabilities influenced federal policy under the Trump administration, particularly where Musk was given broad and direct access to executive decision-making channels, including OPM and the Department of Government Efficiency (DOGE). As a result, key agency officials, including Brooke Rollins, implemented policies such as DRP 2.0 and RTO mandates in alignment with Musk's vision. These policies, though facially neutral, had the predictable and disproportionate effect of targeting qualified federal employees with disabilities—an effect consistent with Musk's expressed views and

therefore probative of discriminatory intent under a "cat's paw" theory of liability. to alleviate severe back pain.

93.     By failing to reevaluate Plaintiff's accommodation a year after its implementation, a reasonable inference arose that the Agency conceded that Plaintiff's disabilities are permanent, there is no need for reevaluation to determine if the accommodations are the most effective, and that he remains a qualified employee with the granted accommodations.

94.     Indeed, there is neither a legitimate business reason nor an essential job duty in existence that justifies revocation of Plaintiff's remote work accommodation and requires him to work on site. *See  Solomon v. Vilsack*, 763 F.3d 1, 5 (D.C. Cir. 2014) ("Once a reasonable accommodation has been granted, an employer cannot simply withdraw that accommodation—unilateral withdrawal of a reasonable accommodation is simply one manner in which an employer might "not mak[e] reasonable accommodations." 42 U.S.C. §12112; *Bilinsky v. Am. Airlines, Inc.*, 928 F.3d 565 (7th Cir. 2019) ("Absent some change in circumstance, an employer may not rescind an accommodation simply because it is inconvenient or burdensome").

**OASCR Reevaluated Plaintiff's Superseding Accommodation to Force Him to RTO**

95.     On or about February 27, 2025, USDA (via Gary Washington, Acting Secretary) and Patricia St. Clair issued a Return to Office (RTO) policy, as a direct and proximate result of Elon Musk's invidious animus and intent to discriminate against qualified individuals with disabilities, that ordered USDA employees to return to in-office work but also stated it does not supersede existing reasonable accommodations of remote work or words to that effect. A copy of the memoranda are set forth in Ex. 9.

96.     Despite this language, Defendant St. Clair, during an OASCR All-Hands meeting held on February 27, 2025, instructed OASCR managers to reevaluate the RAs held by

24

qualified employees with disabilities older than one year, and instructed the Reasonable Accommodation Coordinator Heather Ihlenfeldt to process all RA requests for remote work as the "accommodation of last resort." (St. Clair's directive). A copy of Plaintiff's declaration containing the facts based on his personal observation is set forth in Ex. 8.

97.    However, reassignment is the only lawful accommodation that is allowed to be processed as an accommodation of last resort, and is considered only after an employee alleges they are no longer able to perform the one or more essential duties of their current position. Accordingly, St. Clair's directive was discriminatory on its face because it took placed remote work accommodation currently granted to employees in a revoked or pending status even though they were found by the Agency to be the most effective accommodation by virtue of it being granted to them, and prioritized other less effective accommodations that may be provided in-office at USDA despite them not being equally effective as remote work accommodations.

98.    Here, St. Clair, by direct evidence, displayed invidious animus towards Plaintiff and other qualified employees with disabilities and intent to discriminate against them by forcing them to return to USDA headquarters by revoking their remote work accommodations and replacing them with less effective in-office accommodations. By commanding that their existing RAs of remote work be reevaluated with a proper reason to do so, St. Clair subjected them to a retaliatory hostile work environment on the basis of disability and for requesting the remote work accommodations in the first place. Many disabled employees that Plaintiff spoke with that were also being subjected to discriminatory evaluations expressed the reevaluation process, or undue delay to process their initial accommodations, caused them severe emotional distress, resulting in taking multiple days of sick leave, indicating the policy was objectively and subjectively hostile.

25

99.    Upon information and belief, at all times relevant, similarly situated non-disabled employees living 50 miles outside of the National Capital Region or a USDA hub (including but not limited to, Kristen Hamilton) were not subjected to discriminatory treatment in comparison to Plaintiff. Specifically, Plaintiff had to spend money and time in order to receive new medical information justifying his continued use of the remote work RA but Hamilton was able to remain a remote employee despite not having a disability, upon information and belief, during the same time period without having to undertake such endeavors.

100.    By ordering Ms. Ihlenfeldt to conduct, in conjunction with each employee's supervisor, a reevaluation of each employee's remote work accommodation, St. Clair conspired with Ihlenfeldt and said supervisors, including Allen, to violate Plaintiff's and other disabled employees' rights afforded them under the Rehabilitation Act. This conspiracy resulted, in most cases, in a failure to provide them with equally effective accommodations after revoking their remote work accommodations including repeated reevaluation periods. Likewise, Plaintiff is at high risk of having his remote accommodation revoked due to the discriminatory reevaluation process.

**Musk's Discriminatory Animus Transferred to USDA Managers via the RTO Policy**

101.    The conspiracy to discriminate against disabled employees by forcing employees back into the office without equally effective accommodations was the brainchild of Elon Musk.

102.    Musk's intent to discriminate against qualified employees with disabilities was transferred to Rollins, and to each USDA manager or agent in charge of implementing or advising others on implementing the discriminating Agency policy, including Bremmer, St.

Clair, Hutson, Allen, and Ihlenfeldt for USDA (and unknown others) via the cat's paw theory of liability.

103.    The Supreme Court set forth the standard for prevailing on a cat's paw theory in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011). The plaintiff in *Staub* did not contend that the manager who made the ultimate decision to fire him harbored the prohibited discriminatory motive, but that his direct supervisors did, and that those supervisors' bias influenced the ultimate decision maker. *Id.* at 1190. *Staub* held that a plaintiff could prevail on such a theory "if [1] a supervisor performs an act motivated by [discriminatory] animus, [2] that is intended by the supervisor to cause an adverse employment action, and ...[3] that act is a proximate cause of the ultimate employment action." *Id.* at 1194. *See also Burley v. AMTRAK*, 801 F.3d 290, 297 (D.C. Cir. 2015)

104.    Rollins' continued inaction following Plaintiff's whistleblower disclosure of the conspiracy to her via a March 28, 2025 email—despite her role as final policymaker—constitutes tacit agreement with the discriminatory policy and ratification of the conspiracy's objectives.

105.    Allen, Plaintiff's supervisor, ordered Plaintiff to undergo reevaluation as directed by St. Clair and requested Ihlenfeldt to set up the reevaluation interactive process with Plaintiff without first making an individualized determination that Plaintiff's accommodation was no longer effective.

106.    Accordingly, St. Clair's intent to discriminate against individuals with disabilities, including Plaintiff, transferred to Allen, Huston, and Ihlenfeldt, even in the absence of statements raising a reasonable inference that Allen and/or Ihlenfeldt themselves were motivated even in part by disability discrimination.

107.    The goal of the conspiracy after ordering a pretextual reevaluation of qualified disabled individuals' existing remote work accommodations, including Plaintiff's, was to

falsely determine the existing remote work accommodation was no longer effective, and then to put in place in-office accommodations that are not ineffective as a pretext for discrimination.

108.    Thus, by forcing Plaintiff and other disabled employees to return to work under discriminatory coercive conditions, Musk and all managers his intent to discriminate transferred to, Plaintiff has been placed at high risk of resigning rather than endure the pain and discomfort of the ineffective accommodations.

109.    This was Musk's goal all along, upon information and belief, and every manager who went along with the plan is culpable and liable for damages as architect Musk himself.

110.    This directive was not based on individualized assessments, nor was it supported by evidence that Plaintiff's condition had changed or that the existing accommodation imposed undue hardship.

111.    On March 24, 2025, Defendant Allen questioned why Plaintiff was not in the office via email, despite having received Plaintiff's valid documentation confirming he has an RA of remote work in January 2025 that had been in place since July 2023, and after Allen announced that the RTO policy does not apply to employees with remote work RAs. A copy of the email is set forth in Ex. 9.

112.    On or around March 24, 2025, after Plaintiff opposed Allen's order as discriminatory on the basis of disability since the RTO guidance did not supersede his existing RA, Defendant St. Clair confirmed in writing that all RAs over one year were being subjected to mandatory review and that Plaintiff was to work with his supervisor (Allen) to get reevaluated.  See Ex. 9.

113.    On or about March 25, 2025, Defendant Heather Ihlenfeldt, acting in her official capacity as a Reasonable Accommodation Coordinator within USDA's Office of Human Resources Management (OHRM), sent Plaintiff an email initiating a meeting scheduled for

28

April 3, 2025. The stated purpose of the meeting was to "reengage in the interactive process and review [Plaintiff]'s accommodation, his restrictions, the essential functions of his position of record, and the new business operating requirements." The email explained that the Office of Operations had been notified by the Office of the Secretary on January 24, 2025, of the Return to Office (RTO) Policy and changes to USDA's business operating requirements. It further stated that "supervisors and managers were directed to review reasonable accommodation (RA) decisions relevant to their respective employees," citing Departmental Regulation 4300-008 as the procedural basis. A copy of the meeting invite is set forth in Ex. 10.

114.    This communication confirms Defendant Ihlenfeldt's participation in the policy's coordinated implementation and her active role in orchestrating a department-wide reevaluation of disability-based accommodations under the pretext of revised operating standards. While framed as part of the "interactive process," the timing, content, and framing of the meeting demonstrate that the true intent was to pressure Plaintiff into relinquishing or narrowing his accommodation. The initiation of this process by direct order from the Office of the Assistant Secretary for Civil Rights, led by St. Clair at all times relevant, and its framing within a broader workforce restructuring initiative, supports Plaintiff's assertion that USDA leadership conspired to undermine previously approved accommodations through the guise of legitimate review. Defendant Ihlenfeldt's action constitutes a further overt act in support of the conspiracy to coerce, retaliate, and ultimately remove the remote work accommodation from protected employees like Plaintiff, in violation of the Rehabilitation Act and 42 U.S.C. § 12203.

115.    Defendants Hutson, Brammer, and Rollins, with knowledge of the unlawful policy, failed to object or intervene despite their role as senior USDA officials and ability to recommend or direct action that would be in alignment with the Rehabilitation Act that

would lead to the reversal of the policy mandating discriminatory reevaluations of reasonable accommodations in conjunction with the RTO directives, despite their knowledge of St. Clair's actions and directives as described herein.

116.    By failing to offer legal correction or halt the unlawful RTO-related reevaluation despite knowledge and opportunity, Brammer affirmatively acted in furthering the conspiracy via malfeasance and omission.

117.    Upon information and belief, Hutson knew or should have known the reevaluation policy was discriminatory on the basis of disability yet she agreed to participate in the conspiracy as a 2nd level reviewer of appeals of denials of requests for remote work accommodations by pretextually planning on upholding all denials as valid.

118.    Defendant Vivian Hutson, in her leadership capacity at USDA and Allen's direct supervisor, was copied on internal communications regarding the reevaluation of Reasonable Accommodations and was fully aware of the directive initiated by Defendant St. Clair and enforced by Defendant Allen. Although she held authority to intervene, halt, or question the discriminatory implementation of this policy—particularly where it disproportionately affected employees with targeted disabilities—Hutson took no steps to do so. Her deliberate silence and institutional endorsement of the policy constituted knowing acquiescence and ratification of its unlawful objectives via malfeasance.

119.    By failing to object or exercise her authority to halt the reevaluation process, Hutson knowingly furthered the conspiracy's goal of coercing employees with disabilities to relinquish their accommodations or resign. Her role, while not overtly operational, constitutes an affirmative agreement through inaction, consistent with case law holding that conspirators may act through conscious acquiescence and strategic omission.

120.    Once a reasonable accommodation has been granted, an employer cannot simply withdraw that accommodation—unilateral withdrawal of a reasonable accommodation is

simply one manner in which an employer might not make reasonable accommodations. 42 U.S.C. §12112; *Bilinsky v. Am. Airlines, Inc.*, 928 F.3d 565 (7th Cir. 2019) ("Absent some change in circumstance, an employer may not rescind an accommodation simply because it is inconvenient or burdensome"); *see also, Kass v. Synovus Fin. Corp.*, 800 F. App'x 804, 810 (11th Cir. 2020)1; *Isbell v. John Crane, Inc.*, 30 F. Supp. 3d 725, 734 (N.D. Ill. Mar. 21, 2014).

121.    Defendants John and Jane Does 1-10 are unknown USDA officials who, upon information and belief, participated in or facilitated an alleged conspiracy to violate Plaintiff's rights under 42 U.S.C. §§ 1985(3) and 1986 that were unlawful under the Rehabilitation Act and the 5th Amendment.

122.    The reevaluation policy imposed emotional distress, reputational harm, financial loss, sick and annual leave usage, and threatened loss of employment or performance consequences on Plaintiff, who had been rated "Fully Successful" for the duration of his remote work RA.

123.    The defendants' reevaluation policy and current procedures and practices for processing reasonable accommodation requests at all times relevant were not valid, job-related, or justified by neither business function nor necessity. The continued use of such policies and practices reflects an intention to discriminate against Plaintiff in violation of the Rehabilitation Act.

124.    These defendants conspired with each other to violate Plaintiff's rights under the Rehabilitation Act with reckless disregard for his health and safety and therefore can be held liable for compensatory and punitive damages in their individual capacities for their actions or inaction to prevent said actions from occurring.

31

**The Reduction In Force Policy Furthered Disability Discrimination at USDA**

125.    In or around late 2024, Elon Musk, acting in his capacity as a volunteer advisor to the federal government under the Department of Government Efficiency (DOGE), began publicly advocating for policies designed to drastically reduce the size of the federal workforce. His influence within this advisory body extended to the highest levels of executive leadership, including coordination with then-formal and informal appointees, and with officials at the U.S. Office of Personnel Management (OPM) and agency leadership teams at USDA, including Rollins, Bremmer, St. Clair, Hutson, and others.

126.    On or about January 12, 2025, Musk co-authored an opinion piece published in The Wall Street Journal titled "The Case for a Leaner, Harder-Working Federal Workforce."[5] In that piece, Musk advanced a deliberate plan to reduce federal employment through pressure tactics, stating, "The administration's new policy will make federal jobs less comfortable, prompting some employees to return to the office—but prompting others to resign."

127.    Musk's statement reveals an explicit intent to induce resignations through hostile working conditions, particularly via unlawful Deferred Resignation Program and RIF mandates.

128.    In direct alignment with this agenda, USDA leadership placed multiple Equal Employment Opportunity (EEO) Specialists on indefinite paid administrative leave, including Darnella McGuire, a Supervisory Equal Employment Specialist who worked for USDA, Animal & Plant Health Inspection Service (APHIS), and conducted barrier analyses for the agency as required per Rehabilitation Act and EEOC guidance. These individuals were responsible for preparing federally mandated reports to the EEOC and

---

[5] Musk, E., & Ramaswamy, V. (2024, January 12). *The case for a leaner, harder-working federal workforce*. The Wall Street Journal. https://www.wsj.com/opinion/musk-and-ramaswamy-the-doge-plan-to-reform-government-supreme-court-guidance-end-executive-power-grab-fa51c020

Congress, including barrier analyses, demographic equity assessments, and promotion data for individuals with targeted disabilities. Their functions are required under Section 501 of the Rehabilitation Act and Executive Order 14035. The removal of these employees from duty constitutes a clear breach of statutory mandates and signals a systematic effort to dismantle the agency's internal disability rights infrastructure. This action has created a chilling effect on other civil rights personnel within USDA, including Plaintiff, and created a retaliatory hostile work environment for him.

129.    Plaintiff, a Final Agency Decision (FAD) writer and Compliance Specialist, is among the few remaining USDA employees whose official duties involve enforcing Section 501 through the adjudication of disability-based discrimination claims. As part of this role, Plaintiff has repeatedly flagged investigative failures and deficiencies in cases involving individuals with disabilities, often encountering managerial resistance and dismissal, to the point where findings of discrimination submitted to Allen by Plaintiff were subsequently changed to non-findings without notice. These patterns support a reasonable inference that USDA leadership has deprioritized or actively suppressed its obligations under the Rehabilitation Act as part of Musk's goal to discriminatorily reduce the Federal workforce on the basis of disability.

130.    Furthermore, Plaintiff was previously tasked with training other coworkers and was requested by Acting Director Kimberly Strickland, on or around October 2024, to create FAD writing training that would be used to train another Division in CCRE. This request establishes that, upon information and belief, no one else within USDA is currently trained to carry out this core legal function at an expert level other than Plaintiff or his colleagues in EAD.

131.    Thus, the inclusion of the elimination of EAD and/or Plaintiff's position in a RIF would leave the agency vulnerable to discrimination and unable to fulfill its obligations to

issue Final Agency Decisions protecting its employees from the same, as required by Federal law.

132.    Such an action would not only violate Section 501 but would also reflect discriminatory and retaliatory intent, targeting the very employees whose functions are designed to protect civil rights within the federal workplace.

133.    As a direct result of this chilling atmosphere, Plaintiff has experienced increased stress, psychological distress, and physical symptoms tied to his disability. The retaliatory climate has led him to take significantly more sick leave than usual, not as an act of disengagement, but out of necessity due to the emotional toll of performing legally mandated compliance work and FAD writing in an environment hostile to such enforcement. Plaintiff explains, in his declaration, these health complications are based on actual knowledge and events that he and his colleagues at USDA are going through, as is set forth in Ex. 8 and incorporated herein by reference.

134.    Plaintiff now lives under a credible and ongoing fear of being subjected to a discriminatory Reduction in Force (RIF) or otherwise removal based on restructuring. Plaintiff reasonably believes that his position is at high risk of elimination based on recent communications, policy shifts, and the placement of similarly situated EEO and civil rights professionals on administrative leave.

135.    Additionally, Plaintiff fears being involuntarily demoted from his current GS-13 grade to a GS-11, or being forcibly relocated to an agency field hub in another part of the country under the pretextual justification of "being closer to customers"—a rationale that does not apply to Plaintiff's actual job duties nor his current remote work accommodation. *Id.*

136.    Plaintiff's sole customers are internal to the agency: other USDA employees whose discrimination claims he is tasked with adjudicating in Final Agency Decisions. His role

does not involve public-facing services or fieldwork that would justify physical relocation. Accordingly, any such action would be baseless, punitive, and clearly pretextual—part of a broader effort to sideline employees whose work protects the civil rights of individuals with disabilities.

137.    This credible threat of displacement, demotion, or removal has materially impacted Plaintiff's health, created ongoing emotional injury, and interfered with his ability to carry out his statutorily mandated responsibilities without fear of reprisal. It has also made clear that any application of RIF policies to Plaintiff is not neutral, but the continuation of a targeted campaign to suppress legal compliance, eliminate protected disability-related functions, and neutralize the employees who remain committed to upholding the Rehabilitation Act within USDA. *Id.*

138.    Musk's proposed RIF strategy, which was reviewed and implemented by OPM and later disseminated to federal agencies, including the U.S. Department of Agriculture (USDA). The RIF policy, upon information and belief, is being facilitated by Defendants Rollins, St. Clair, Brammer, and/or unknown others.

139.    The animus articulated by Musk was transferred through the cat's paw doctrine to the federal officials (including the OASCR Defendants) who followed or enforced Musk's discriminatory RIF guidance—either directly or under political pressure—and became conduits for his discriminatory intent.

140.    As a result, Plaintiff, a qualified individual with a disability, and other similarly situated employees, were subjected to an unlawful and discriminatory RIF or threat of the same. The threat remains continuous and daily, wherein no training or deep explanation has been offered to show how an RIF works, nor has St. Clair guaranteed fairness during any RIFs she may implement when asked by Plaintiff, replying only that she remains "in lockstep" with the administration priorities.

**Failure to Uphold Retention/Advancement Duties for Targeted Disability Employees**

141.    Plaintiff was originally appointed to federal service under Schedule A, a noncompetitive hiring authority designed to facilitate the entry of qualified individuals with disabilities into federal employment. On or around July 2024, Plaintiff was converted to the Competitive Service after successful performance and completion of his probationary period. Plaintiff is currently classified by the agency as an individual with a targeted disability, as defined by 29 C.F.R. § 1614.203(a)(5), based on his diagnosis of Post-Traumatic Stress Disorder (PTSD).

142.    Pursuant to 29 U.S.C. § 791(d) and 29 C.F.R. § 1614.203(d), USDA is required to implement and maintain an Affirmative Action Plan that ensures not only the hiring but also the placement, retention, and advancement of individuals with disabilities, including those with targeted disabilities. The regulations explicitly state that an agency fails to satisfy this requirement unless it adopts a Plan that includes specific procedures and commitments to identify and support employees who are hired under authorities like Schedule A or who otherwise qualify as individuals with disabilities.

143.    Despite having successfully transitioned into the Competitive Service and continuing to serve in a statutorily mandated compliance role, Plaintiff has been targeted for reevaluation of his Reasonable Accommodation, threatened with job loss or reassignment under USDA's Reduction in Force (RIF) planning, and denied meaningful opportunity for advancement. These actions represent a departure from USDA's mandatory duty to retain and support employees with targeted disabilities, and reflect a broader institutional failure to adhere to the core tenets of the Rehabilitation Act.

144.    Plaintiff also reasonably fears that his role may be reclassified under any future implementation of Schedule F, as he performs policy-influencing duties related to civil

36

rights enforcement. Such a reclassification would amount to a constructive elimination of disability rights protections and a circumvention of legal compliance obligations under the Rehabilitation Act, and a circumvention of USDA's legal obligations to ensure retention and advancement of employees with disabilities.

145.    Plaintiff's specialized duties are not political in nature but are statutorily required, objective, and rooted in compliance with federal law. Reclassification under Schedule F, in this context, would disproportionately impact employees with disabilities—especially those who serve as internal watchdogs against unlawful discrimination. As such, any future invocation of Schedule F to demote, remove, or sideline Plaintiff would be facially neutral in form, but discriminatory in effect, and violate both the spirit and letter of the Rehabilitation Act, since the act requires affirmative action for qualified disabled employees including ensuring their retention once employed.

146.    Despite the USDA's obligations under the Rehabilitation Act to maintain a workforce where at least 2% are individuals with targeted disabilities, Plaintiff faces potential reclassification under Schedule F. Such a move would not only contravene the agency's affirmative action goals but also subject Plaintiff to at-will employment status, jeopardizing his position and undermining federal disability employment objectives.

**OASCR'S ATTEMPT TO FORCE PLAINTIFF TO RESIGN AGAINST HIS WILL**

147.    On April 21, 2025, Plaintiff engaged in protected activity under the Whistleblower Protection Act and the Rehabilitation Act by opposing in good faith the coercive RTO policy mandating reevaluation of his reasonable accommodation as discriminatory and in violation of the Rehabilitation Act via an email to Allen. A copy of that email and containing these messages is set forth in Ex. 11.

148.    In said email, Plaintiff stated in part:

The [reevaluation] process is very stressful and I object to the process itself, because I [] shouldn't have to participate because I believe in good faith it is unlawful as stated below and causing me to feel harassed on the basis of disability. It is causing me severe emotional harm resulting me taking sick days because [i]t is difficult to get a new medical provide[r] to affirm my conditions due to booking issues (I have some appointments this week, others [] I have consulted with have declined to fill out the paperwork), and am afraid that no matter what paperwork I provide [it won't be approved] since you and Ms. Ihlendfeldt were instructed by Ms. St. Clair to treat remote accommodations as the accommodation of last resort, even though it is the most effective accommodation for my medical needs and there is no other alternate accommodation that is equally effective. It is also as a result affecting my work performance in the interim and I allege that you and Ms. Ihlendfeldt along with Ms. St. Clair and unknown others are conspiring to violate my rights under the Rehabilitation Act. The blank[et] rule that all reasonable accommodations over a year old must be reevaluated is arbitrary and capricious and was not based on an individualized assessment of my granted reasonable accommodation. Why don't you stop harassing me and stop this process across the board and stand up for justice Sir?

149.    On April 21, 2025, apparently in response to said email set forth in Ex. 11, Allen and St. Clair informed Plaintiff that he had accepted the Deferred Resignation Program 2.0 (DRP 2.0) and would be placed on paid administrative leave effective April 30, 2025 after completing several off-boarding tasks. These directives constituted adverse actions and engendered an immediate hostile work environment based on his protected activity.

150.    On April 21, 2025, Allen forwarded Plaintiff an email where HR Specialist Mechele Towe indicated Plaintiff had accepted the DRP 2.0 contract and specified that Plaintiff would need to prepare to be placed on administrative leave on April 30, 2025.

151.    On April 21, 2025, St. Clair sent and forwarded an email to Plaintiff with instructions to begin offboarding by completing various knowledge sharing tasks for his review.

152.    On April 21, 2025, Ihlenfeldt, in response to Allen's email, responded that Plaintiff's RA reevaluation case was now closed. A copy of that email containing these messages is set forth in Ex. 12.

**The Deferred Resignation Program (DRP) 2.0 Explained**

153.    The DRP 2.0 program was offered from April 1, 2025, and ran through April 8, 2025. This program mirrors the benefits of an initial first offering which, in exchange for employees agreeing to resign effective September 30, 2025, and waiving their right to file a complaint or sue USDA, employees will be placed on paid administrative leave starting on or around May 1, 2025 in the interim and not have to work. A copy of an email from USDA explaining how the program works and the DRP 2.0 contract is set forth in Ex. 13.

154.    USDA employees who were interested in the DRP 2.0 program were to indicate their interest by clicking an "I'm interested" pushbutton on or before April 8 in the eHR website link.

155.    A subsequent link was sent with the contract to employees who had indicated their interest which they would have to sign and submit on or around April 15, 2025, and click an "accept" pushbutton in the eHR system, in order to be accepted into the program.

156.    All employees who only indicated interest and did not submit a signed contract and/or electronically accept the agreement would not be considered as having been officially accepted into the program.

157.    Although Plaintiff initially clicked the "I'm interested" button associated with the DRP 2.0 program, Plaintiff never signed and submitted the DRP 2.0 agreement nor clicked any box indicating his acceptance of the DRP 2.0 contract. A copy of his interest only verification of the DRP 2.0 from the eHR system is set forth in Ex. 14.

158.    In fact, on April 8, 2025, Plaintiff submitted an email seeking clarification about the DRP 2.0 contract and requesting amendments to said contract to OHRM Director Rhonda

39

Carr. In said email, Plaintiff explicitly stated that any expression of "interest" in the DRP 2.0 program submitted by Plaintiff was not to be construed as an acceptance of the contractual offer. Plaintiff further requested amendments to the contract and requested that legally required disclosures under the Older Workers Benefit Protection Act (OWBPA) be sent to him before he clicked the "I'm interested" button. Said email was not substantively responded to prior to the deadline to show interest in the DRP 2.0 program. A copy of the email Plaintiff sent to Rhonda Carr requesting said amendment is set forth in Ex. 14.

159.    On April 21, 2025, Plaintiff responded via email to Allen's and St. Clair's false statements or  insinuations he had signed the DRP 2.0 contract by forwarding to them documentary evidence—the email he previously provided to Carr requesting amendments to the contract—to them, Carr and to Heather Ihlenfeldt, the Reasonable Accommodation Coordinator. A copy of the email chain documenting these events in the current and prior paragraph is set forth in Ex. 13.

160.    Later that day, Rhonda Carr confirmed that neither Plaintiff nor herself (the Agency's designee with Signature Authority for the DRP 2.0 program) had signed the contract and stated Plaintiff was not accepted into the DRP 2.0 program.

161.    Accordingly, a reasonable inference arises that St. Clair, Allen, Ihlenfeldt, and unknown others conspired to violate Plaintiff's right of continued Federal employment under the 5th Amendment by claiming he accepted the DRP 2.0 and took additional actions by advising Plaintiff to onboard (Allen and St. Clair) and canceling his reasonable accommodation case (Ihlenfeldt) in furtherance of the conspiracy.

162.    In addition, neither Allen, St. Clair rescinded their actions or directives to Plaintiff after being placed on notice by Rhonda Carr that he had not signed or accepted the DRP 2.0 agreement.

40

163.    Allen's, St. Clair's, and Ihlenfeldt's statements, actions and omissions constituted an agreement to conspire, and deliberate acts in furtherance of a conspiracy, to violate his 5th Amendment Constitutional right of due process in connection with the loss of his property right of continued Federal employment, right to be free from retaliation for engaging in protected activity under the Rehabilitation Act.

164.    As a result of the conspiracy, Plaintiff suffered emotional distress, exacerbation of his PTSD, and reputational harm; his coworker, a timekeeper, was notified he accepted the DRP 2.0 when had not. Plaintiff has a reputation of a stellar employee and not a quitter and has publicly denounced the DRP program, but the Agency's actions tarnished his reputation. See Ex. 12.

**Musk's Threat Of Removal Of Plaintiff Via the "5 Bullets" E-mail**

165.    Additionally, Plaintiff was informed by Elon Musk via Twitter on or around February 22, 2025 and continuing, that if he did not submit a weekly email listing what he did that week, he would be subject to disciplinary action or possible termination. "Consistent with President @realDonaldTrump's instructions, all federal employees will shortly receive an email requesting to understand what they got done last week," Musk wrote. "Failure to respond will be taken as a resignation." [6]

166.    This message was followed by a similar email issued by OPM directly to Plaintiff's USDA email, requesting 5 bullet points describing tasks Plaintiff accomplished last week, upon information and belief, at Musk's direction. Musk's intent to discriminate transferred to the unknown government agent who sent the email to Plaintiff. This coercive and arbitrary directive was issued under the guise of productivity tracking but served as an unlawful condition on Plaintiff's continued employment. Given Plaintiff's full-time status

---

[6] Musk, Elon. Twitter Post. February 22, 2025. https://x.com/elonmusk/status/1893386883444437415

in the competitive service, this action—especially when paired with the forced reevaluation and DRP 2.0 resignation scheme—constitutes a violation of his Fifth Amendment right to continued employment without due process. Upon information and belief, this directive was influenced or encouraged by Elon Musk's stated goals of purging allegedly "unproductive" federal workers, forming another step in the broader conspiracy to marginalize individuals with disabilities and undermine merit-based protections.

167.    In addition, Plaintiff serves as a federally appointed Equal Employment Opportunity Specialist tasked with duties mandated under 29 U.S.C. § 791 and EEOC Management Directive 715 (MD-715), including performing barrier analysis and ensuring equitable access to federal employment for historically marginalized groups. These duties are statutorily and regulatorily required, not discretionary. Upon information and belief, Executive Orders and policy directives influenced by Elon Musk—including, but not limited to, efforts by the Department of Government Efficiency (DOGE)—have sought to eliminate or marginalize such roles, falsely characterizing them as unlawful "DEIA" initiatives, while targeting positions that track and enforce racial and disability equity. Musk's well-documented disdain for DEI programming, coupled with statements that disparage the legitimacy of federal civil rights roles, reflect invidious racial and anti-disability animus. As a Black EEO Specialist performing barrier analysis duties, Plaintiff is among the class of individuals Musk's campaign was designed to undermine. The elimination or reclassification of Plaintiff's role through RIF or DRP programs constitutes an intentional interference with the terms and conditions of Plaintiff's employment, motivated by race and in violation of 42 U.S.C. § 1981.

42

**Harm Suffered by Plaintiff As a Result of The Defendant's Actions and Inactions**

168.    As a direct result of Defendants' actions and omissions, Plaintiff has suffered significant emotional distress; financial strain, including out-of-pocket costs for medical consultations and documentation forced by an unlawful reevaluation process; physical aggravation of underlying chronic conditions, exacerbated by the stress and fear of being forced into an unsafe work environment without necessary accommodations; lost promotional or career advancement opportunities due to retaliatory actions and marginalization; harm to professional reputation and standing; and loss of dignity and morale, resulting from being treated as a liability despite receiving fully successful performance ratings and formal commendations in FY23 and FY24.

## COUNT I

### CIVIL CONSPIRACY TO VIOLATE SECTION 501 OF THE REHABILITATION ACT

**(29 U.S.C. § 791; 42 U.S.C. § 1985(3))**

**Against Defendants Elon Musk, Brooke Rollins, Steven Brammer, Patricia St. Clair, Vivian Hutson, Heather Ihlenfeldt, and John/Jane Does**

169.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

170.    Defendants Musk, St. Clair, Allen, and Ihlenfeldt, in concert and conspired to deprive Plaintiff, as a member of a protected class (individuals with disabilities), of the equal protection of the laws and of rights secured by the Rehabilitation Act. 42 U.S.C. § 1985(2). Subsection (3), titled "[d]epriving persons of rights or privileges," prohibits conspiracies to deprive "any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws" on account of any protected trait. *Id.* § 1985(3); *Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 688, 386 U.S. App. D.C. 144 (D.C. Cir. 2009) ("Section 1985(3) provides a cause of action against two or more persons

who participate in a conspiracy motivated by class-based discriminatory animus."). *Jones v. Ogletree et al.*, 2025 U.S. Dist. LEXIS 59302, *12-13; 2025 WL 958196

171.    Musk displayed his class-based animus against qualified individuals with disabilities when he posted on Twitter mocking a disabled employee of Twitter, who needed reasonable accommodations to remain qualified.

172.    St. Clair displayed her class-based animus against qualified individuals with disabilities by announcing directives during the February 27, 2025 OASCR All-Hands meeting words to the effect, the remote work accommodations of all disabled employees held for over a year and all pending remote work reasonable accommodation requests will have to be reevaluated with said remote work accommodation only considered as an accommodation of last resort. St. Clair also displayed said animus when she announced during the meeting that she has directed Heather Ihlenfeldt, the OASCR Reasonable Accommodation Coordinator, to process all RAs in this manner.

173.    Derrick Allen displayed this class-based animus against qualified individuals with disabilities when he questioned Plaintiff why he had not returned to work in the USDA headquarters on March 24, 2025, the deadline for all OASCR employees in the National Capital Region to comply with USDA and OASCR's RTO policy, which implicitly exempts individuals from reasonable accommodations of remote work or telework from compliance with the directive. Allen later instructed Heather Ihlenfeldt to set up a meeting to conduct the "interactive process" with himself, Plaintiff, and Ihlenfeldt, under the guise of reevaluating the efficiency of Plaintiff's remote work accommodation. The real reason was to issue a new RA decision stripping Plaintiff of his remote work accommodation and force him to either return to full-time work in the office, face removal, or resign.

44

174.    Ihlenfeldt displayed this class-based animus when she sent Plaintiff a meeting invite for the interactive process reevaluation based on a change in the Agency's business requirements or functions, which were not explicitly defined and purposely ambiguous.

175.    In addition to their own class-based disability animus, Musk's class-based disability animus transferred via the cat's paw to St. Clair, Allen, and Ihlenfeldt, and influenced them to take coordinated action in order to achieve Musk's goals.

176.    In addition to their own class-based disability animus, St. Clair's class-based disability animus transferred via the cat's paw to Allen, Ihlenfeldt, and Mechele Towe, and influenced them to take coordinated action in order to achieve St. Clair's goals.

177.    Defendant Elon Musk conspired with federal officials to orchestrate a biased workforce reduction strategy that unlawfully targeted civil rights adjudicators in violation of 42 U.S.C. § 1985(3).

178.    Musk's influence led to the development and deployment of AI-driven job elimination models that disproportionately impacted employees engaged in civil rights enforcement.

179.    These actions amount to a conspiracy to suppress internal federal complaints of discrimination, eliminate EEO enforcement roles, and weaken civil rights protections across the federal government.

180.    The agreement was followed by coordinated actions by Defendants St. Clair, Allen, and Ihlenfeldt, via meetings, verbal and written correspondence, to reevaluate, undermine, and effectively revoke previously approved reasonable accommodations constituted an invidiously discriminatory animus toward individuals with disabilities.

181.    As an overt act in furtherance of the conspiracy, Defendants Patricia St. Clair, Heather Ihlenfeldt, and Derrik Allen, jointly implemented a blanket reassessment policy that required all existing remote work accommodations over one year old to be resubmitted

for review, regardless of medical documentation or individualized circumstances. This was carried out through coordinated communications including: (1) directives from St. Clair during the February 27, 2025 All-Hands meeting; (2) email confirmations from Allen directing Plaintiff to report to the office and resubmit his RA (March 24, 2025); (3) an official meeting invitation by Ihlenfeldt (March 28, 2025) indicating the reassessment was based on "new business operating requirements" connected to RTO; and (4) a failure by Hutson, the reviewing official, to intervene or stop the reevaluation despite her authority over Allen.

182.    These overt acts demonstrate a coordinated and intentional effort to implement a policy that targeted disabled employees, stripped them of their accommodations without due process, and forced them to choose between their health and their job security.

183.    As a result of the conspiracy, Plaintiff was subjected to disparate treatment compared to similarly situated employees without disabilities who were allowed to continue working remotely if they lived more than 50 miles outside the National Capital Region or a USDA hub without any caveats such as undergoing medical examinations to justify their continued remote work status. Defendants acted with reckless disregard for Plaintiff's federally protected rights.

184.    In addition, other qualified disabled employees with remote work accommodations working at other Agencies, including but not limited to the Department of Defense, were exempted from the RTO policy and did not have to undergo reevaluation of their remote work accommodations; which constitutes proof that the USDA conspirators actively participated in the conspiracy and were not just following orders.

185.    As a direct and proximate result of Defendants' actions, Plaintiff suffered damages including emotional distress, anxiety, reputational harm, diminished morale, and the ongoing threat of job loss and forced return to an unaccommodated workspace.

## COUNT II

### FAILURE TO PREVENT CIVIL RIGHTS VIOLATIONS

#### (42 U.S.C. § 1986 – Against Defendants Rollins, Hutson, and Brammer, in their individual capacities)

186.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

187.    Under 42 U.S.C. § 1986, any person who has knowledge that a conspiracy under § 1985 is about to be committed, and who has the power to prevent or aid in preventing the commission of the same but neglects or refuses to do so, shall be liable to the party injured.

188.    On March 24, 2025, Plaintiff submitted a detailed whistleblower complaint directly to Secretary Brooke Rollins, documenting the unlawful directive issued by Patricia St. Clair requiring reassessment of all previously granted reasonable accommodations (RAs) for remote work older than one year. This directive conflicted with USDA's official Return to Office (RTO) guidance and the Rehabilitation Act, and it effectively targeted disabled employees—including Plaintiff—for discriminatory treatment.

189.    Despite occupying the highest leadership role within the Department and having full authority to intervene, Defendant Rollins failed to act to prevent or investigate the misconduct. Her inaction permitted the unlawful directive to continue and signaled institutional ratification of a policy that lacked legal basis.

190.    Similarly, Defendant Vivian Hutson—a senior official within OASCR and the designated internal reviewer of denied RA decisions—was aware of the discriminatory policy. She was present at the February 27, 2025, OASCR All-Hands meeting where St. Clair announced the blanket reassessment, and she was copied on related internal correspondence thereafter. Hutson had both the knowledge and authority to intervene but took no steps to prevent or halt the illegal conduct.

191.    Both Rollins and Hutson had actual or constructive knowledge of the conspiracy described in Count II. Each had the power, duty, and opportunity to prevent or remedy the unlawful reassessment policy but instead allowed the violations to proceed unimpeded. Their collective inaction facilitated the continuation of the discriminatory scheme in violation of the Rehabilitation Act and constitutional protections under the Fifth Amendment.

192.    Defendant Steven Brammer, Associate General Counsel for USDA, was directly copied on Plaintiff's March 24, 2025 whistleblower complaint, which detailed the unlawful blanket reassessment directive and its conflict with the Rehabilitation Act and USDA's own RTO guidance.

193.    As legal counsel, Brammer had a heightened duty to evaluate the legality of departmental policies and to advise leadership on compliance with federal disability law.

194.    Despite his clear opportunity to intervene, provide corrective legal guidance, or halt the implementation of the policy, Brammer took no discernible action to prevent the ongoing violations. His failure to act, despite actual knowledge and the power to do so, renders him liable under 42 U.S.C. § 1986 for aiding and abetting the continuation of the discriminatory conspiracy.

195.    As a direct result of Rollins, Hutson's, and Brammer's failure to act, Plaintiff Plaintiff suffered: Emotional distress and psychological injury, including anxiety, panic attacks, and insomnia;  Physical aggravation of his pre-existing medical conditions due to fear of accommodation revocation; Financial harm, including pressure to incur unnecessary medical costs;  Reputational damage and diminished professional standing despite high performance ratings;  and ongoing uncertainty and fear of termination or removal, shared by similarly situated employees with disabilities.

48

196.    The failure of Defendants Rollins, Brammer, and Hutson to act was willful, malicious, and in reckless disregard of Plaintiff's federally protected rights. Their dereliction of duty under § 1986 makes them jointly and severally liable for damages, including but not limited to compensatory and punitive damages, resulting from the conspiracy alleged under § 1985(3).

197.    Plaintiff seeks all legal and equitable remedies available under 42 U.S.C. § 1986.

### COUNT III
### CONSPIRACY TO VIOLATE PLAINTIFF'S FIFTH AMENDMENT RIGHTS
### (42 U.S.C. § 1985(3))

**(Against Defendants St. Clair,  Allen, and Ihlenfeldt, in their individual capacities)**

198.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

199.    Defendants Patricia St. Clair, Derrik Allen, Heather Ihlenfeldt, and Vivian Hutson, acting individually and in concert, conspired to deprive Plaintiff of his rights under the Fifth Amendment to the United States Constitution, specifically his right to be free from arbitrary government action affecting his property interest in continued employment and in his lawfully granted reasonable accommodation under the Rehabilitation Act.

200.    Plaintiff's approved remote work accommodation, granted on July 18, 2023, was an essential condition of his continued qualification for federal employment and was legally protected under the Rehabilitation Act of 1973. That accommodation was granted following an individualized assessment confirming that remote work was the most effective and appropriate adjustment for Plaintiff's permanent disability.

201.    Despite USDA policy stating that the Return to Office (RTO) mandate "does not supersede existing reasonable accommodations", Defendants entered into an agreement and executed a policy to reassess and potentially revoke all remote work accommodations that were more than one year old, without regard to performance, need, or effectiveness.

202. On or around Feb. 27, 2025, during a OASCR All-Hands meeting on MS Teams that Plaintiff attended, Plaintiff witnessed St. Clair state that all disabled employees with existing reasonable accommodations of remote work over a year old, and those with pending RA requests of remote work, will be reevaluated. St. Clair further stated she directed RA Coordinator Heather Ihlenfedlt to reevaluate said accommodation requests to see how each employee can be accommodated in the office first with remote work only being considered as an accommodation of last resort.

203. Accordingly, the directives of St. Clair in the previous paragraph evidence St. Clair's intent to discriminate against qualified disabled employees whose granted remote accommodations or requested remote accommodations are the most effective by revoking or not granting those accommodations and forcing them to return to in-office work.

204. On March 24, St. Clair further stated in an email to Plaintiff, "Good morning, please work directly with your supervisor to go through the interactive process to determine whether and to what extent we are able to accommodate your return to the office. I have added Mr. Allen to this email. If your request for an accommodation has been reviewed and denied, it will go through the traditional administrative review as set forth in the Reasonable Accommodation Program. As such, I have not reviewed any of your attached documents."

205. Thus, St. Clair, by her own words and directives, conspired with Elon Musk and took additional steps to violate the civil rights, as established under the Rehabilitation Act, of Plaintiff and all similarly situated employees under her direct or indirect supervision or control. St. Clair exhibited her intent to discriminate against Plaintiff and all similarly situated employees on the basis of disability by directing all supervisors and the Rehabilitation Act to engage in a discriminatory evaluation and reevaluation of their

50

existing RAs or pending RA requests with the goal of revoking existing remote work RAs and denying all pending requests for the same.

206.    A reasonable inference can be made that forcing disabled employees to work in an office environment without equally effective accommodations in comparison to remote work accommodations would cause them physical and emotional harm, resulting in them possibly resigning or being removed for performance or conduct issues arising from said failure to provide effective accommodations.

207.    But for the discriminatory evaluations, Plaintiff and all similarly situated employees would have remained qualified had the RA of remote work not been revoked or denied.

208.    Allen directed, in bad faith and in accordance with St. Clair's directive, Ihlenfeldt to initiate the interactive process with himself, Plaintiff, and Ihlenfeldt in order to accomplish this goal. An email from Ihlenfeldt admitting that Allen directed her to initiate the interactive process with Plaintiff and requesting Plaintiff's accommodation be reevaluated is set forth in Ex. 10.

209.    Ihlenfedlt, trained in the Rehabilitation Act, knew or should have known that St. Clair's directives to her and other members of management constituted discriminatory and arbitrary reevaluations of existing RAs and pending RA requests, but agreed to participate in the conspiracy formulated by Musk and advanced by St. Clair, to violate Plaintiff's civil rights under the act.

210.    Ihlenfeldt sent an email to Plaintiff requesting he take place in an interactive process so his reasonable accommodation of remote work can be reevaluated.

211.    Hutson was placed on notice by OASCR officials that she would be the appellate authority for internal appeals of all reasonable accommodation request denials, and upon information and belief, agreed to deny all appeals of remote work accommodations in order to achieve this goal.

212.    This policy and its implementation constituted a substantive due process violation, as it was:  Arbitrary and capricious, applying a blanket rule without individualized review; Discriminatory, singling out disabled employees for burdensome reevaluation and denial of access to their accommodations;  and without a legitimate government interest, especially where Plaintiff's outstanding performance showed no undue hardship to the Agency.

213.    Defendants further violated procedural due process by:  Failing to provide Plaintiff with notice or a meaningful opportunity to contest the reassessment; Requiring Plaintiff to submit new medical documentation under duress, absent any medical change or undue hardship; Proceeding with reevaluation even after admitting, as in the case of Ms. St. Clair, that they had not reviewed the existing RA documentation or its legal basis.

214.    As a direct and proximate result of the conspiracy, Plaintiff suffered risk of loss and/or loss of legally protected accommodation, emotional distress and anxiety, diminished morale, risk of disciplinary action or removal, a stark choice between his health and his job.

215.    The overt acts in furtherance of this conspiracy include, but are not limited to:  St. Clair's issuance of verbal and written guidance directing blanket reassessment of all remote work accommodations over one year old;  Allen's directive requiring Plaintiff to return to the office, despite receipt of Plaintiff's existing RA approval;  Ihlenfeldt's initiation of the interactive process under a pretextual "business functions" review, misrepresenting the purpose of the process;  Brammer's failure to intervene and unethical advice to the OASCR defendants on how to implement the unlawful practice in a manner that minimizes legal risk to the Agency, and Hutson's failure to object to or halt the policy despite her position as internal reviewer for RA matters, with actual or constructive knowledge of its illegality.

216.    Plaintiff was treated differently from similarly situated USDA employees with disabilities outside of the OASCR chain of command, who were not subject to blanket reevaluation or return-to-office demands.

52

217.    Defendants' conduct was undertaken with reckless disregard for Plaintiff's rights and with discriminatory animus toward individuals with disabilities who depend on remote work accommodations.

218.    Plaintiff seeks declaratory and injunctive relief, compensatory damages, and punitive damages in an amount to be determined by a jury, as well as attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**Count V**

**Violation of the Administrative Procedure Act**

**(5 U.S.C. § 706)**

**(Against Defendant Rollins in her official capacity as Secretary of Agriculture)**

219.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

220.    Under the Administrative Procedure Act (APA), a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions" found to be:  (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;  (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations;  (D) without observance of procedure required by law. (See 5 U.S.C. § 706(2)(A)-(D))

221.    Defendants St. Clair, Allen, Brammer, and Ihlenfeldt acted arbitrarily and capriciously by issuing or enforcing a blanket policy to reevaluate all remote work reasonable accommodations (RAs) granted over a year ago. This reevaluation policy, carried out without individualized assessments or consideration of the Rehabilitation Act's legal requirements.

222.    Plaintiff placed the head of the Agency, Brooke Rollins, on notice of the unlawful discriminatory enactment of the RTO policy by the OASCR defendants via direct email to

official email and to the email dedicated to the Office of the Secretary. Accordingly, it is reasonably inferred that Rollins knew of their actions and upon information and belief, took no action to stop them from continuing to engage in those unlawful acts.

223.    Whether it was informally created or formally adopted, the return-to-office reevaluation directive is unlawful. The OASCR Defendants are liable in their individual capacities for conspiring to implement it.

224.    Defendant Rollins, as Secretary of Agriculture, had the legal power and duty to halt the implementation of the same yet failed to do so — thus triggering APA review in her official capacity.[7]

225.    Rollins' silence and inaction contradicts USDA's own Return-to-Office (RTO) guidance which explicitly stated that existing disability accommodations would not be overridden; Violates established statutory obligations under Section 501 of the Rehabilitation Act, including the requirement to engage in an individualized, interactive process; Was implemented without public notice and comment, in violation of 5 U.S.C. § 553; Operated as a de facto modification of agency policy with tangible effects on employee rights and benefits, thereby qualifying as final agency action subject to APA review.

226.    Defendant Rollins, as Secretary of Agriculture, ratified the unlawful policy through inaction and silence, despite receiving detailed whistleblower disclosures from Plaintiff highlighting the discriminatory nature and legal contradictions of the reevaluation directive.

227.    The closure of Plaintiff's RA file by Heather Ihlenfeldt and USDA's refusal to grant or process Plaintiff's renewed accommodation request—despite clear evidence of ongoing

---

[7] Plaintiff pleads in the alternative under Fed. R. Civ. P. 8(d). While the policy may have originated informally and is *ultra vires*, Defendant Rollins' failure to repudiate or halt its implementation upon direct notice constitutes ratification sufficient to establish official agency action for purposes of APA review.

eligibility and medical documentation—constitutes "final agency action" under the Administrative Procedure Act. Pursuant to *Bennett v. Spear*, 520 U.S. 154 (1997), final agency action occurs when rights or obligations have been determined or legal consequences will flow. Here, USDA's refusal to act resulted in Plaintiff being placed at immediate risk of constructive discharge or reclassification, despite his continued eligibility and request for interactive dialogue. Such finality gives rise to judicial review under 5 U.S.C. § 702 and further substantiates Plaintiff's right to declaratory and injunctive relief.

228.    The ratification of this unlawful informal policy has resulted in legal and tangible harm to Plaintiff and similarly situated employees, including:  Forced compliance with arbitrary documentation demands;  Psychological and emotional distress;  Reputational harm;  Erosion of established reasonable accommodations without due process;  and Violation of statutory rights.

**COUNT VI**

**CIVIL CONSPIRACY TO VIOLATE SECTION 501 OF THE REHABILITATION ACT**
(29 U.S.C. § 791; 42 U.S.C. § 1985(3))

**(Against Defendants Elon Musk, Brooke Rollins, Steven Brammer, Patricia St. Clair, Vivian Hutson, Heather Ihlenfeldt, and John/Jane Does)**

229.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully stated herein.

230.    Section 501 of the Rehabilitation Act of 1973 requires each federal agency to "submit to the Equal Employment Opportunity Commission and to the Committee an affirmative action program plan for the hiring, placement, and advancement of individuals with disabilities." See 29 U.S.C. § 791(b).

231.    USDA is statutorily obligated to implement policies and maintain staff necessary to comply with this mandate, including conducting barrier analyses, monitoring promotion

data for individuals with targeted disabilities, and issuing timely Final Agency Decisions involving disability discrimination.

232.    Plaintiff serves as a Final Agency Decision (FAD) writer and Compliance Specialist. His position is essential to USDA's fulfillment of its legal responsibilities under Section 501. Plaintiff is among the few employees specifically trained to draft legally sound decisions in cases involving disability discrimination.

233.    Plaintiff has repeatedly flagged insufficient EEO investigations and urged legal compliance with Section 501 in the adjudication process, often encountering resistance or disregard by agency leadership.

234.    In concert with Elon Musk's publicly stated campaign to reduce the federal workforce by eliminating remote accommodations and weakening DEI enforcement, USDA leadership—including Defendants Rollins, Brammer, St. Clair, Hutson, and Ihlenfeldt—undertook a coordinated effort to dismantle USDA's disability rights infrastructure.

235.    As part of this effort, USDA placed multiple Equal Employment Opportunity Specialists—whose roles directly implement Section 501—on indefinite administrative leave, depriving the agency of key personnel responsible for reports to the EEOC and Congress, including barrier analyses and affirmative action metrics.

236.    Upon information and belief, Defendants intend to eliminate these positions through a Reduction in Force (RIF) policy. These actions serve no legitimate operational purpose and are instead aimed at weakening or eliminating statutorily required disability equity functions.

237.    Plaintiff reasonably fears that his own position will be eliminated or downgraded through this RIF process, and/or that he will be involuntarily reassigned to a distant USDA

hub under the pretext of proximity to "customers"—even though his duties serve internal USDA personnel, not the public.

238.    These actions constitute a conspiracy to violate Plaintiff's civil rights and disrupt statutory enforcement of Section 501 of the Rehabilitation Act in violation of 42 U.S.C. § 1985(3).

239.    As a direct and proximate result of this unlawful conspiracy, Plaintiff has suffered and continues to suffer from severe stress, emotional distress, increased medical leave usage, and ongoing fear of retaliation and job loss.

240.    Defendants' actions have caused irreparable harm and created a chilling effect that materially interferes with Plaintiff's ability to perform his job duties under Section 501, and if not enjoined, will undermine USDA's capacity to comply with federal law.

## COUNT VII

### VIOLATION OF EQUAL PROTECTION UNDER THE FIFTH AMENDMENT
**(Against Defendants Elon Musk, Brooke Rollins, Steven Brammer, Patricia St. Clair, Vivian Hutson, Heather Ihlenfeldt, and John/Jane Does)**

241.    Plaintiff incorporates all prior paragraphs as if fully stated herein.

242.    The Fifth Amendment of the United States Constitution guarantees individuals the right to equal protection under the law, which prohibits federal actors from treating similarly situated individuals differently without a rational basis or in a manner motivated by discriminatory animus.

243.    Defendants, acting under color of federal authority, treated Plaintiff (a disabled male employee) less favorably than similarly situated non-disabled employees and female employees (including but not limited to Kristen Hamilton, a non-disabled female employee in EAD) by subjecting him to targeted reevaluation of his Reasonable Accommodation and including his position in a Reduction in Force process while allowing non-disabled employees

to remain in remote positions without similar scrutiny. This discriminatory treatment, without a rational basis, constitutes a violation of the Equal Protection component of the Fifth Amendment to the U.S. Constitution.

244.    Plaintiff was subjected to a targeted reevaluation of his existing, medically supported Reasonable Accommodation for full-time remote work, despite having received approval based on a documented disability and successfully performing his duties.

245.    Upon information and belief, numerous non-disabled USDA employees including Hamilton were permitted to continue working remotely without being subjected to medical reevaluation, accommodation recertification, or any adverse personnel action.

246.    Plaintiff's job duties are performed exclusively through written legal analysis and communication with internal USDA personnel, and do not involve public-facing work or field activities that would justify physical relocation or mandatory in-office presence. Nevertheless, Plaintiff's RA was reevaluated under pressure and scrutiny not applied to non-disabled employees.

247.    This disparate treatment constitutes a violation of Plaintiff's right to equal protection under the Fifth Amendment, as there is no rational basis for treating Plaintiff less favorably than non-disabled employees engaged in equivalent remote work.

248.    Defendants' conduct is further exacerbated by their roles in implementing a broader policy—guided in part by Elon Musk's anti-remote and anti-DEI ideology—that disproportionately impacted disabled federal employees and violated the principle of equal application of workplace policies.

## COUNT VIII
## CONSPIRACY TO COERCE, INTIMIDATE, AND RETALIATE IN VIOLATION OF 42 U.S.C. § 12203

**(ADA Title V / Section 504 incorporated via Section 501 of the Rehabilitation Act)**
**Against Defendants Musk, Rollins, St. Clair, Brammer, Hutson, Ihlenfeldt, and**
**John/Jane Does in their individual capacities**

249.  Plaintiff incorporates by reference all preceding paragraphs as if fully stated herein.

250.  42 U.S.C. § 12203(b), made applicable to the federal government through the Rehabilitation Act, prohibits any person from coercing, intimidating, threatening, or interfering with any individual exercising rights protected by the ADA and Rehabilitation Act, including the right to request and maintain reasonable accommodations and to oppose unlawful practices.

251.  Plaintiff has consistently exercised rights protected by the Rehabilitation Act, including requesting and maintaining a full-time telework reasonable accommodation based on a documented disability, and advocating internally for legal compliance when investigating and adjudicating disability-based discrimination.

252.  Rather than supporting this protected activity, Defendants engaged in a concerted effort to coerce and silence Plaintiff. These efforts included retaliatory scrutiny of his accommodation, threats of relocation, demotion, or termination under the guise of a Reduction in Force, and the removal of similarly situated disability compliance personnel from their posts under pretextual justifications.

253.  Elon Musk's public statements, including those mocking disabled remote workers and opposing DEI frameworks, provided the ideological and political context for USDA's retaliatory policies. The USDA's application of these policies—especially targeting Plaintiff and civil rights enforcement personnel—was coordinated by Defendants Rollins, Brammer, Hutson, St. Clair, and Ihlenfeldt, with knowledge of Plaintiff's protected status and activities.

254.  These actions were intended to coerce Plaintiff into silence, suppress the lawful enforcement of the Rehabilitation Act, and deter further opposition to discriminatory practices. The effect has been a chilling of Plaintiff's protected activity, emotional and psychological distress, and ongoing fear of termination or reassignment.

255.    Defendants' coordinated conduct constitutes a conspiracy to violate Plaintiff's rights under 42 U.S.C. § 12203 and the Rehabilitation Act.

256.    Plaintiff seeks injunctive relief, compensatory and punitive damages, and any other relief the Court deems just and proper.

## COUNT IX

### Bivens Claim-Violation of Fifth Amendment Right to Continued Employment
### (brought against Elon Musk and Rollins in their Individual Capacities via Section 42 U.S.C. 1983)

257.    Plaintiff realleges and incorporates all prior paragraphs.

258.    Plaintiff brings this claim pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), which provides a cause of action for damages against federal officials who violate constitutional rights under color of federal authority. The Fifth Amendment guarantees federal employees in the competitive service a constitutionally protected property interest in continued employment, which cannot be deprived without due process of law.

259.    Musk and Rolins, acting outside the scope of any lawful federal role and not entitled to qualified immunity, caused and participated in the deprivation of Plaintiff's due process rights, warranting personal liability for compensatory and punitive damages.

260.    Defendant Elon Musk, acting in his individual capacity and under color of federal advisory authority through the Department of Government Efficiency (DOGE), engaged in a pattern of conduct designed to coerce the resignation, reassignment, or removal of federal employees, including Plaintiff, without due process. These efforts included public statements encouraging retaliation against remote employees, and specific policy endorsements that were adopted and operationalized within USDA.

261.    As part of this pattern, Plaintiff was subjected to arbitrary performance requirements, including a directive that failure to send a weekly list of five completed tasks, sent at the

direction of Musk and Rollins to Plaintiff via USDA's Department of Operations and via email from opm.gov, would result in discipline or termination. Such a requirement, applied discriminatorily and without legal basis, constitutes a deprivation of substantive and procedural due process, in violation of the Fifth Amendment to the United States Constitution.

262.    Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages, against Musk in his individual capacity for this ultra vires, retaliatory action.

### Count X
### Violation of 42 U.S.C. § 1981 – Intentional Racial Discrimination
### (Against Elon Musk in His Individual Capacity)

263.    Plaintiff realleges and incorporates all prior paragraphs. Defendant Elon Musk, acting outside the bounds of any official federal role, interfered with Plaintiff's federally protected rights as a Black employee to enjoy the benefits and protections of his federal employment contract, free from racial discrimination. As a qualified Black disabled employee, Plaintiff has the right to equitable and affirmative action under the Rehabilitation Act to continued employment via reasonable accommodations and equitable hiring opportunities via Schedule A.

264.    Musk's public comments opposing diversity, equity, and inclusion (DEI) efforts and disparaging remote employees were weaponized within the USDA's implementation of discriminatory policies such as DRP 2.0 and the Return-to-Office policy. These policies intentionally and disproportionately harmed Black federal employees, including Plaintiff, and were implemented with knowledge of their disparate impact. Defendant's actions violated 42 U.S.C. § 1981 and entitle Plaintiff to compensatory and punitive damages.

265.    Plaintiff is a Black federal employee in the competitive service who was threatened with disciplinary action and potential removal if he did not submit a weekly "5 bullets" email outlining tasks completed—despite no such requirement being imposed on similarly situated

white employees. Several hundred White employees in DoD and USDA were told to stand down and not reply but Stewart was told to comply. This coercive condition was implemented under policies and cultural directives influenced by Defendant Elon Musk, who has publicly disparaged remote workers and DEI efforts, and who exerted advisory influence over the Department of Government Efficiency (DOGE), which collaborated with USDA leadership. These actions interfered with Plaintiff's right to maintain and enjoy the benefits of his employment contract on equal terms, in violation of 42 U.S.C. § 1981 and subjected him to emotional distress, lack of enjoyment of work, and exacerbation of his PTSD. Defendant Musk acted outside the scope of any lawful federal authority and in his individual capacity, entitling Plaintiff to compensatory and punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, based on the foregoing, requests the following relief:

A. A permanent injunction ending USDA's arbitrary and capricious reevaluation of Plaintiff's granted reasonable accommodation of remote work and barring its agents, employees and representatives, and any and all persons acting in concert with them, from engaging in any further unlawful discriminatory practices, policies, customs, usages as set forth herein;

B. An appointment of a third-party monitor or special master, based on the ongoing risk of irreparable harm and systemic harm to similarly situated individuals, to independently review all remote work accommodations requests and reevaluations from January 2024 to and continuing until January 2028, with quarterly reviews submitted to the Court;

C. A declaratory judgment that USDA's reasonable accommodation policies, practices and procedures challenged herein are unlawful and in violation of the Rehabilitation Act;

D. A declaratory judgment that Defendants St. Clair, Hutson, Allen, and Ihlenfeldt conspired to violate Plaintiff's rights under the Rehabilitation Act and the 5th Amendment of the United States Constitution in violation of 42 U.S.C. § 1985(3), and a declaratory judgment that Defendant Rollins failed to act to prevent the conspiracy to violate Plaintiff's rights under the Rehabilitation Act and the 5th Amendment of the United States Constitution, in violation of 42 U.S.C. § 1986;

E. An Order requiring USDA to initiate and implement programs that:

(1) will provide reasonable accommodations for for qualified employees with disabilities;

(2) will remedy the effects of USDA's past and present unlawful policies, practices and procedures as it relates to the reasonable accommodation requests; and

(3) will eliminate the continuing effects of the discriminatory practices described above;

F. $200,000,000.00 in non-pecuniary compensatory damages for Plaintiff suffering emotional distress, mental anguish, pain and suffering, loss of enjoyment of work, violation of his Constitutional and statutory rights, exacerbation of PTSD, anxiety, and panic attacks, and reputational harm caused by Defendants' unlawful coercive conduct and retaliatory actions, to be found jointly and severally liable against all Defendants;

G. $2,000,000,000.00 in Punitive damages, to be found jointly and severally liable against all Defendants, for having acted with malice and/or reckless indifference to Plaintiff's Federally protected rights;

H. Award Plaintiff reasonable attorneys' fees, if applicable, and litigation costs and expenses;

I. Declaratory Judgment declaring that the USDA's blanket policy requiring reevaluation of all reasonable accommodations for remote work issued over one year prior is: Contrary to the

Rehabilitation Act; Arbitrary and capricious; Implemented without observance of required procedures; Invalid under the Administrative Procedure Act (5 U.S.C. § 706);

J. Preliminary and Permanent Injunction enjoining USDA and its officers, agents, and assigns from: Enforcing or implementing the aforementioned reevaluation policy; Mandating renewed medical documentation from individuals with approved reasonable accommodations absent individualized assessments; Taking any adverse employment action—including revocation of accommodations, or disciplinary recommendations—based on refusal to comply with the unlawful policy;

K. § 1361 Mandamus – Ministerial Duty to Uphold Accommodation Protections

USDA's failure to honor the terms of Plaintiff's previously granted reasonable accommodation, including its refusal to acknowledge his ongoing Schedule A conversion status and his right to equitable treatment under MD–715 reporting obligations, represents a violation of its ministerial duties under 29 U.S.C. § 791 and 5 C.F.R. § 1614.203. Because USDA is required by law to maintain a compliant Affirmative Action Plan for Individuals with Disabilities, including maintaining sufficient hiring, placement, and advancement opportunities for such individuals, its coordinated actions to suspend, remove, or reclassify accommodation recipients—absent individualized assessments or meaningful engagement—constitutes a legal breach of a non-discretionary duty. Plaintiff therefore seeks a writ of mandamus under 28 U.S.C. § 1361 to compel USDA and its officers to restore his accommodation and cease discriminatory RIF or DRP-related proceedings that directly contradict those statutory duties; and also to refrain from future implementation of similar blanket policies absent compliance with statutory requirements; and to Issue a formal notice of withdrawal or suspension of the policy to all affected employees;

L. Vacatur of the Policy and all associated actions arising from the reevaluation directive;

M. Costs and Fees as authorized under the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable provision;

N. Pecuniary compensatory damages in an amount to be determined by a jury at trial; O. Plaintiff also seeks costs and attorney's fees, if applicable, pursuant to the Equal Access to Justice Act and pursuant to 42 U.S.C. § 1988(b);

P. Any other equitable relief to which Plaintiff is entitled or the Court thinks is just and/or equitable;

Q. Pursuant to Rule 38 of the Federal Rules of Civil Procedure and applicable law, Plaintiff hereby demands a trial by jury on all issues so triable, including but not limited to his claims brought under 42 U.S.C. §§ 1985(3), 1986, the Administrative Procedure Act, and all other applicable constitutional and statutory provisions;

R. A declaration that Defendants' actions—individually and collectively—constituted unlawful coercion, intimidation, interference, and retaliation in violation of 42 U.S.C. § 12203 and the Rehabilitation Act, by targeting Plaintiff's protected activity, including the exercise and defense of his right to a reasonable accommodation and opposition to discriminatory practices;

S. A permanent injunction enjoining Defendants from further engaging in any act of coercion, intimidation, interference, or retaliation against Plaintiff or similarly situated employees based on the exercise of rights protected under the Rehabilitation Act or ADA;

T. Enjoin Defendants from reclassifying Plaintiff's position or converting it to any exempted personnel schedule (e.g., Schedule F) in retaliation for protected activity or as part of any unlawful effort to suppress enforcement of civil rights statutes;

U. A declaration that Defendants' actions against Plaintiff—a Competitive Service employee with a targeted disability, originally hired under Schedule A—violate USDA's obligations

under 29 U.S.C. § 791(d) and 29 C.F.R. § 1614.203(d), which requires the agency to affirmatively support the retention and advancement of such individuals at all levels of federal employment;

V. A permanent injunction prohibiting Defendants from reclassifying Plaintiff's position under Schedule F or any similar designation that would alter his employment protections, in violation of the Rehabilitation Act's mandates to retain and advance individuals with targeted disabilities;

W. A permanent injunction prohibiting Defendants from processing Plaintiff under the DRP 2.0 or any similar forced resignation program without a signed agreement, and requiring USDA to immediately restore Plaintiff to his full telework status and remove any administrative leave designation not voluntarily elected by Plaintiff;

X. Plaintiff further requests that all damages awarded—including compensatory, consequential, and punitive damages—be assessed against the Defendants on a joint and several basis, as each acted in concert or with substantial participation in the unlawful conduct alleged herein;

Y. Pecuniary losses including but limited to lost wages, lost benefits, and out-of-pocket medical and legal expenses; and

Z. Consequential damages including but not limited to diminished future earnings and other foreseeable injuries proximately caused by Defendants' unlawful conduct.

Plaintiff brings this action not only to protect his own rights under the Constitution and the Rehabilitation Act, but to preserve the rule of law and defend the civil rights of all individuals with disabilities employed by the United States government. In the spirit of truth, equity, and conscience, Plaintiff respectfully submits this Complaint in faith that the judicial process will provide redress where internal safeguards have failed. Plaintiff also acknowledges

with reverence the recent passing of Pope Francis, a global voice for the marginalized, the poor, and the disabled. In speaking truth to power through this filing, may this seed of justice—planted in the soil of hardship and hope—bear good fruit in due time. Godspeed.

Respectfully Submitted on this 1st day of May, 2025,


/s/ Fenyang Ajamu Stewart
**Plaintiff,** *pro se*
**4390 King St. Unit 16**
**Alexandria, VA 22302**
fstewart2@gmail.com
**757.506.4579**

**CERTIFICATION**

I, Fenyang Ajamu Stewart, hereby certify and declare under penalty of perjury on this <u>1st day</u> <u>of May, 2025</u>, that the statements made in the foregoing are true and correct to the best of my knowledge, except for any statements made upon information and belief, and I am competent to testify thereto.

05/01/2025
Date Executed

/s/ Fenyang Ajamu Stewart___
Plaintiff, *pro se*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY and declare, under penalty of perjury, that on May 1, 2025, I filed the foregoing Amended Complaint with the Clerk's office by hand and caused a copy of the same, along with a summons, to be served upon Brian Hudak at brian.hudak@usdoj.gov, and USADC.ServiceCivil@usdoj.gov, counsel for Defendants.

Executed on: 05/01/2025

/s/ Fenyang Ajamu Stewart__
Plaintiff, *pro se*

68